## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

IN RE:
SCOTT ALLYN SIMONS,

                              Debtor.                    **Bk. No. 20-40631**

NATIONWIDE JUDGMENT RECOVERY,                            **CHAPTER 7**
INC.,
                              Plaintiff                  **Adv. No. 21-04027**

        vs.

SCOTT ALLYN SIMONS
aka ZEEKREWARDS,

                              Defendant

## NATIONWIDE JUDGMENT RECOVERY, INC.'S
## RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Nationwide Judgment Recovery, Inc. ("Nationwide" or "Plaintiff"), the

Plaintiff and a creditor in the above styled action, by and through undersigned counsel, and files

this response to Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure, made applicable in this Adversary Proceeding by Federal Rule of

Bankruptcy Procedure 7056, and in support thereof states as follows:

## I.  INTRODUCTION & BACKGROUND

Plaintiff, Nationwide Judgment Recovery, Inc. ("Nationwide" or "Plaintiff") is the holder

of a claim against Scott Allyn Simons aka ZEEKREWARD ("Debtor" or "Defendant") arising

from fraudulently-transferred funds obtained as a result of his participation in one of the largest

Ponzi schemes in United States history.  Attached hereto as Exhibit "A" is the Judgment entered

against him on August 14, 2017 in the amount of $190,959.94 (Bell v. Disner, 3:14-cv-91-GCM

(W.D.N.C. 2014), D.E. No. 179).  Defendant's attempt to discharge his personal liability on this judgment is at issue in this adversary proceeding.

On August 17, 2012, the Securities and Exchange Commission filed a Complaint against Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul R. Burks, its principal, to shut down the Ponzi scheme known as "ZeekRewards" as violative of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) (and Rule 10b-5 thereunder) of the  Exchange Act (Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks, 3:12-cv-519-GCM (W.D.N.C. 2012), D.E. No. 2).  On that same date, an Agreed Order was entered Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC ("RVG") and appointing Kenneth D. Bell (hereafter "Bell") as the Receiver over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a www.ZeekRewards.com and its subsidiaries and any businesses or business names under which it did business,  Rex Venture Group, LLC d/b/a ZeekRewards (3:12-cv-519-GCM, D.E. No. 4).  The Order authorized and directed Bell, as RVG's Receiver, to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and any other legal and equitable relief that the Receiver deemed necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate.  Id.

On February 28, 2014, Bell filed a Complaint against certain named defendants and the "Net Winner Class"[1] in the ZeekRewards scheme, seeking a determination that the net winnings of the Net Winner Class were fraudulent transfers from RVG, and requesting an Order that the net winnings of each of the Net Winners class members are Receivership property and, as such,

---

[1] The Receiver's Complaint defined a "Net Winner" as an affiliate who received $1,000 or more from ZeekRewards than was paid into the scheme.  (Bell v. Disner, D.E. 1,  paragraph 2).

are subject to a constructive trust for the benefit of the Receivership estate and ordering the repayment of those winnings back to RVG (Bell v. Disner, 3:14-cv-91-GCM, D.E. No. 1). Despite a massive number of victims of ZeekRewards, there were a very select few Net Winners. More specifically, only about 9,000 - approximately 1% of the total participants – were Net Winners. (Bell v. Disner, 3:14-cv-91-GCM, D.E. No.1, paragraph 2). Defendant-Debtor herein was a member of the Net Winner Class sued by the Receiver and ordered to return his winnings. Attached hereto as Exhibit "B" is the statement from RVG detailing Defendant's payments into, and the funds deemed fraudulently transferred from, the ZeekRewards Ponzi scheme.

While Bell has recouped millions of dollars from ZeekRewards executives and some of largest Net Winners, the true victims of the scheme are still far from whole. In November of 2016, the Western District Court of North Carolina held that the net winnings received from ZeekRewards were fraudulent transfers that must be repaid to the receiver and that were subject to a constructive trust for the benefit of the receivership estate (Bell v. Disner, 2016 WL 7007522 *11 (W.D.N.C. 2016), aff'd sub nom Bell v. Li Yu Chen, 731 Fed.Appx. 239 (July 23, 2018)). A true and correct copy of the Order is attached hereto as Exhibit "C."

As a result Bell's pursuit of the fraudulently-transferred funds, some Net Winners have filed bankruptcy in an attempt to discharge judgments obtained by Bell. Plaintiff's adversary proceeding is an action to have one such debt, arising from the Debtor's participation in an illegal Ponzi and pyramid scheme, declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(19).

Defendant's Motion for Summary Judgment must be denied. As will be shown below, the Ponzi scheme and securities violations that resulted in the SEC's shutdown of ZeekRewards in Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com

and Paul Burks, 3:12-cv-519-GCM (W.D.N.C. 2012) are inextricably intertwined with the

Judgment against the Defendant; one could not exist without the other. The Judgment against the

Defendant is a debt owed by the Defendant for violation of securities law. Further, Defendant

herein committed common law fraud in the purchase and/or sale of securities by his participation

in ZeekRewards. Defendant knew that the Ponzi scheme was enormously profitable, and

looking for a way to maximize the fraudulent transfers he was already receiving from

ZeekRewards, opened another ZeekRewards account using his son's name and social security

number, thereby allowing a judgment in the amount of $208,703.78 to be entered against his son.

*See* Affidavit of Anthony Allyn Simons, attached hereto as Exhibit "D." As the Judgment against

the Defendant is for the violation of securities law or for common law fraud, deceit or

manipulation in the connection with the purchase and sale of a security, the Defendant's Motion

for Summary Judgment should be denied.

## II. ARGUMENT AND CITATION OF AUTHORITIES

A. Summary Judgment Standard

This Court should grant summary judgment if "there is no genuine issue as to any

material fact and … the moving party is entitled to judgment as a matter of law." Federal Rule

of Civil Procedure 56(c); Federal Rule of Bankruptcy Procedure 7056. A fact is material if it

might affect the outcome of a proceeding under the governing substantive law. Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuine issues

of material fact exist when a rational finder of fact could not rule in favor of the non-movant. In

re Bryson, 187 B.R. 939, 955 (Bankr. N.D. Ill. 1995).

The moving party bears the burden of showing that there is no genuine issue of material

fact in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In determining whether the movant has met its burden, the Court should consider all reasonable inferences in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  However, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., *supra*.

B.     The Debt Arising from Defendant's Net Winnings Is Nondischargeable Pursuant to 11 U.S.C. § 523(a)(19)

Section § 523(a)(19) of the Bankruptcy Code provides that a Chapter 7 discharge does not discharge a debt -

(19)  that –

 (A)  is for –

   (i)  the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

   (ii)  common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

 (B)  results, before, on, or after the date on which the petition was filed, from -

   (i)  any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

   (ii)  any settlement agreement entered into by the debtor; or

   (iii)  any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19) precludes dischargeability of a debt if two conditions are met.  It must be

proven that (1) the debt is for the violation of securities law **OR** common law fraud in

*connection with* the purchase or sale of any security, and (2) the debt must be memorialized in a

judicial or administrative order or settlement agreement.  The Judgment against the Defendant is

a debt owed by the Defendant for violation of securities law and/or common law fraud in

connection with the purchase or sale of any security, and the debt is memorialized in a Judgment,

attached hereto as Exhibit "A."

1.  The Judgment against the Defendant is a debt owed by the Defendant for violation of
    securities law.

The Judgment against the Defendant in this matter was entered pursuant to a fraudulent

transfer action, and relates back to the original securities violation case.  The District Court for

the Western District of North Carolina has subject matter jurisdiction over the fraudulent transfer

action because it relates directly to the claims in the SEC Action (Bell v. Disner, 3:14-cv-91-

GCM (W.D.N.C. 2014), D.E. No.  179, paragraph 32 states "Also, this Court has subject matter

jurisdiction under 28 U.S.C. § 1367 because this action is directly related to the claims in the

SEC Action, concerns property within this Court's exclusive control and/or is in furtherance of

the duties given to the Receiver by this Court.")  Here, Defendant's argument in his Motion for

Summary Judgment ignores that the Ponzi scheme and securities violations are inextricably

intertwined with the Judgment against the Defendant; one could not stand without the other.  *See*

ln re Chan, 355 B.R. 494, 503 (Bankr. E.D. Pa. 2006) ("[T]he merits of the § 523(a)(l9)

discharge exception are indistinguishable from the merits of the underlying legal claim.").  This

Court may look beyond the wording of the Judgments to the allegations contained in the

pleadings which gave rise to the judgments.  "[W]hether or not [the debtor] expressly admitted

guilt as part of the settlement, the terms of the Consent explain the origin of the disgorged debt,

to wit, the securities violations alleged by the SEC in the complaint." In re Gilley, Bankr. No.

12-11443, Adv. No. 12-2066, 2013 WL 4460499, at *3 (Bankr. M.D.N.C. Aug. 19, 2013). "[I]t

is well established that the court may conduct an analysis of the genesis of the claims in the

SEC's complaint in order to determine whether the debt at issue is nondischargeable." Id. at *4.

As noted by the Supreme Court, "the mere fact that a conscientious creditor has previously

reduced his claim to judgment should not bar further inquiry into the true nature of the debt."

Brown v. Felsen, 442 U.S. 127, 138 (1979). "Congress intended the application of the Securities

Act and Exchange Act 'to turn on the economic realities underlying a transaction, and not on the

name appended thereto.'" Bell v. Disner, 2014 WL 6978690 at *2 (W.D.N.C. Dec. 9, 2014)

(quoting United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849 (1975)). "[A] change in

the Bankruptcy Code's nondischargeability provision indicated that Congress intended the fullest

possible inquiry to ensure that all debts arising out of fraud are excepted from discharge, no

matter their form." Archer v. Warner, 538 U.S. 314, 315 (2003) (internal quotations omitted).

> The present case is factually distinct from *Archer* and *Brown* in one respect.  Here,
> the underlying fraud is twice removed from disputed debt.  [The creditor's] debt
> arises directly from a state court judgment, which arose from breach of a
> promissory note, which arose from a settlement of alleged fraudulent conduct.  The
> Court finds this factual difference irrelevant.  In § 523 proceedings, the relevant
> inquiry focuses on the conduct from which the debt originally arose.  Liable parties
> can not erase the history of a debt's origin through a settlement and subsequent
> breaches of the settlement.  *Archer* and *Brown* hold that bankruptcy courts should
> look beyond the judgment or settlement to determine whether the underlying
> conduct included conduct prohibited by § 523.

In re Schwartz, Case No. 07-30508, Adv. No. 07-03170, 2007 WL 3051865, at *3 (Bankr. S.D.

Tex. Oct. 17, 2007).

The final Judgment entered in this case, against both the class of Net Winners as a whole and the individual winners, stems from the Order granting the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class (Exhibit "C") entered on November 29, 2016.  The Court's 27-page opinion details the factual and legal basis for its decision that ZeekRewards operated as a Ponzi and pyramid scheme and that the net winnings received by the Net Winners are as a matter of law fraudulent transfers that must be returned to the Receivership.  Prior to the entry of the final judgments in <u>Bell v. Disner</u>, there was a dispute period that allowed participants to adjust their balances, object to the settlement and judgments, and negotiate settlements with the Receiver. While he could have challenged the Judgment itself along with the proposed amount of the Judgment at that time, Defendant chose to remain silent.  A final judgment was entered against the Defendant, a judgment now held by Nationwide.  Attached hereto as Exhibit "E" is the Assignment of Judgment to Nationwide Judgment Recovery, Inc.  The Defendant filed bankruptcy and now seeks to discharge the debt for the profit he earned from an illegal Ponzi scheme, effectively nullifying years of litigation, the main purpose of which was to protect the victims of the scheme and provide them with some compensation.  "Because Zeek's net winners 'won' the victims' money in an unlawful combined Ponzi and pyramid scheme, the net winners are not permitted to keep their winnings and must return the fraudulently transferred winnings to the Receiver for distribution to Zeek's victims."  <u>Bell v. Disner</u>, 2014 WL 6978690, at *2.

    a.  The Debtor need not be personally liable for the securities violation, so long as the judgment arises from a securities violation.

The debtor's personal culpability in the securities violation is irrelevant, so long as the judgment is for a securities violation.  *See* <u>Lunsford v. Process Technologies Servs. (In re Lunsford)</u>, 848 F.3d 963 (11th Cir. 2017).  If the debtor is a party to the judgment and the

judgment is for a securities violation, whether the debtor is the one who violated a securities law

is irrelevant. Id. at 968 ("[S]ection 523(a)(19)(A) precludes discharge regardless of whether the

debtor violated securities laws as long as the securities violation caused the debt."). In Lunsford,

the court held that "text and structure" of the section "unambiguously prevents discharge of debts

'for the violation' of securities laws" and makes no distinction between debts arising as acts of

the debtor versus acts of third parties that merely result in liability of the debtor. Id. "If

Congress had wanted to limit section 523(a)(19)(A) based on debtor conduct, it could have done

so as it did with other provisions in the statute." Id.

    The Lunsford court knowingly created a split with the Ninth and Tenth Circuits, each

having previously reached contrary conclusions. See Okla. Dep't of Sec. v. Wilcox, 691 F.3d

1171, 1177 (10th Cir. 2012) ("Permitting debtors, who were not personally found to be in

violation of securities laws, to obtain relief from a judgment intended only to redistribute funds

among multiple victims of a Ponzi scheme is in accordance with the plain language of the

statute."); Sherman v. Sec. Exch. Comm'n (In re Sherman), 658 F.3d 1009, 1012 (9th Cir. 2011)

("§ 523(a)(l9) only prevents the discharge of a debt for a securities violation when the debtor is

responsible for that violation."). In Wilcox, the debtors' liability was not for a violation of

securities laws "but only for unjust enrichment." Wilcox, at 1175. Had the debtors in Wilcox

been prosecuted for securities laws violations, as they were in Lunsford, the court noted that any

judgment obtained "would no doubt be considered nondischargeable under § 523(a)(l9)." Id. at

1176. As in the Eleventh Circuit, the culpability of the debtor is irrelevant under the Wilcox

ruling. As stated by the court –

> "[T]he level of culpability of the debtors has no bearing on our interpretation of
> 523(a)(19), which only requires us to determine if the judgments at issue are for
> a violation of securities laws. The Department chose not to prosecute [the

debtors] for securities violations.  Our task is not to determine whether they
committed such violations but whether the judgment against them is 'for'
securities violations.  We therefore focus not on the underlying facts but on the
nature of the judgments at issue."

Id. at 1174, n. 5.

The debtor in Sherman, the conflicting Ninth Circuit case, was likewise not charged with a

violation of the securities laws but for a breach of a fiduciary duty.  Again, the court in Sherman

suggested that had the SEC charged the debtor with a securities violation, his debt could also

have been nondischargeable.  "Admittedly, nothing in the text of any of these provisions makes

it clear that the exceptions should apply only to debtors who are responsible for the wrongdoing

that caused the debt."  Sherman, at 1015.  "The Ninth Circuit acknowledged that the plain

language of section 523(a)(19)(A) did not limit application based on debtor conduct, but

determined that the text was ambiguous in the light of circuit precedent that had held that similar

portions of section 523 required inquiry into debtor conduct."  Lunsford, at 969.  The Eleventh

Circuit departed from the Ninth Circuit's holding in Sherman as being grounded in non-binding

precedent and as following prescriptions of general statutory purpose over the plain text of the

statute.  In neither Wilcox nor Sherman was the judgment in which the debt was incorporated a

judgment for a securities violation.

     Both Wilcox and Sherman contained lengthy dissenting opinions supporting the Eleventh

Circuit's later analysis of whether a debtor must be personally involved in violations of federal

or state securities laws.  As stated in the dissenting opinion in Wilcox -

     [T]he majority misinterprets 11 U.S.C. § 523(a)(19) to render nondischargeable
     only those debts that arose from the debtor's personal violation of federal or state
     securities laws.  Nothing in the plain language of § 523(a)(19), particularly when
     read together with the rest of the statute, supports such an interpretation.  Instead,

10

§ 523(a)(19) must be read more broadly to encompass not only those debts that
arose from the debtor's own violation of federal or state securities laws, but also
*those debts that are representative of violations of federal or state securities
laws committed by others*.

Wilcox, at 1177 (emphasis added). *Id.* at 1019.  Likewise, the dissent in <u>Sherman</u> noted that a

debt can be "for" the violation of securities laws when the debtor personally committed the

violation, or "when it is an obligation to return the proceeds of the violation being held in trust

for the wrongdoer." <u>Sherman</u>, at 1019.  Even in a case where the debt arose from a settlement

agreement wherein the debtor did not admit liability, the court found the debt nondischargeable

under section 523(a)(19).  *See, e.g.*, <u>In re Loughery</u>, 457 B.R. 904 (Bankr. N.D. Ga. 2011)

("[T]he settlement of the … litigation without an admission of liability did not change the nature

of the debt or preclude a finding that the Debtor owes a debt for violation of a securities law.")

(citing <u>Archer v. Warner</u>, 538 U.S. 314 (2003)).  Here, while the Defendant, even if he did not

personally commit a securities violation, there is no doubt that the judgment arose from a Ponzi

scheme that violated federal securities law.

    2.  The Judgment against the Defendant is a debt owed by the Defendant for common law
       fraud, deceit, or manipulation in connection with the purchase or sale of any security.

The debt owed by the Debtor-Defendant is likewise for common law fraud, deceit or

manipulation in connection with the purchase or sale of a security.  Section 523(a)(19)(A)

includes common law fraud in securities transactions under § 523(a)(19)(A)(ii).  In the Order

granting the Receiver's Motion for Summary Judgment, upon which Plaintiff's Judgment is

based, the Court found that the Defendant violated N.C. Gen. Stat. § 39-23.4(a)(1), the North

Carolina Uniform Fraudulent Transfer Act.  The NCUFTA permits a receiver to avoid a transfer

made "with the intent to hinder, delay, or defraud any creditor of the debtor" within four years

after the transfer was made. "Many courts have held that the intent to defraud can be presumed

when transfers are in furtherance of a Ponzi scheme. The 'Ponzi scheme presumption' has been

long settled in a number of jurisdictions and under an analogous section of the Bankruptcy Code

[§ 548(a)(1)(A)]." Bell v. Disner, 2016 WL 7007522, at *10.

> Transfers in furtherance of a Ponzi scheme "have achieved a special status in fraudulent transfer law" from which intent of *actual fraud may be inferred.* In re Cohen, 199 B.R. 709, 717 (9th Cir. BAP 1996).

> Courts in the Receivership context outside bankruptcy also routinely apply the Ponzi scheme presumption to avoid fraudulent transfers. *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014); Wing v. Dockstader, 482 Fed.Appx. 361, 363 (10th Cir. 2012); *see also*, Warfield v. Carnie, No. 3:04-cv-0633, 2007 WL 1112591, at *9 (N.D. Tex. Apr. 13, 2007).

> The U.S. Bankruptcy Court for the Middle District of North Carolina held that the 'Ponzi scheme presumption' of actual fraudulent intent also arises in fraudulent transfer actions brought under N.C. Gen. Stat. § 39-23.4(a)(1). Ivey v. Swofford (In re Whitley), 463 B.R. 775, 781 (Bankr. M.D.N.C. 2012).

Id. at *11 (emphasis added).

"As the Court has already decided that Defendant committed actual fraud in the

transaction … the sole remaining issue is whether the transaction is a security." In re Sato, 512

B.R. 241, 252 (Bankr. C.D. Cal. 2014). "Under the federal Howey test, a security is a contract,

transaction or scheme whereby a person invests his money in a common enterprise and is led to

expect profits solely from the efforts of the promoter or a third party." Id. (citing SEC v. W.J.

Howey Co., 328 U.S. 293, 298-99, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946) ("Howey")).

> Courts have applied the Howey test to define a wide range of Ponzi schemes, pyramid schemes, and multi-level marketing schemes-including internet-based schemes-as securities. *See, e.g* ., SEC v. SG Ltd., 265 F.3d 42 (1st Cir. 2001)

(internet-based Ponzi scheme); <u>SEC v. Int'l Loan Network, Inc.</u>, 968 F.2d 1304, 1307-08 (D.C. Cir. 1992)(pyramid scheme); <u>SEC v. Koscot Interplanetary, Inc.</u>, 497 F.2d 473, 478-79 (5th Cir. 1974) (multi-level marketing scheme); <u>SEC v. Glenn W. Turner Enters.</u>, 474 F.2d 476, 482 (9th Cir. 1973) (get-rich-quick marketing scheme).  The same holds true even if not all aspects of a scheme constituted securities, and even where some aspects of a scheme may have been legitimate. *See, e.g.,* <u>SEC v. Int'l Loan Network, Inc.</u>, 770 F. Supp. 678 (D.D.C. 1991) (finding that pyramid recruiting could be regulated as security even if other aspects of club memberships did not constitute securities), *aff'd,* 968 F.2d 1304 (D.C. Cir. 1992); <u>Koscot</u>, 497 F.2d at 475-76 (similar).

<u>Bell v. Disner</u>, 2014 WL 6978690, at *2.  Investment in the ZeekRewards Ponzi scheme involved the sale or marketing of "securities" pursuant to the <u>Howey</u> test.  *See* <u>Id.</u> ("The <u>Howey</u> test is a 'flexible' principle 'capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'") (quoting <u>SEC v. Edwards</u>, 540 U.S. 389, 393 (2004)); *Accord* <u>SEC v. SG Ltd.</u>, 265 F.3d 42 (1st Cir. 2001).

Defendant herein violated the N.C. Gen. Stat. § 39-23.4(a)(1), the North Carolina Uniform Fraudulent Transfer Act.  Moreover, he admits that he purchased and sold securities as part of his investment in ZeekRewards.  The majority of the fraudulent transfers the Defendant received from ZeekRewards were through the "Retail Profit Pool," or "RPP," which operated as a Ponzi scheme.  *See* Exhibit B attached hereto, which shows that Defendant received $139,715.97 solely from RPP.  The SEC Complaint,  paragraphs 20 through 35, attached hereto as Exhibit "F," provides detail into how the RPP worked, which included requiring Affiliates like Defendant herein to sell penny auction bid packages directly to retail customers and/or purchase VIP bids and given them away as samples.  *See* Exhibit "F," paragraph 25.  Defendant admits purchasing bids every day (Defendant's Response to Plaintiff's Requests for Admission, paragraphs 55, 70) and that every time he sold Retail Bids or gave away VIP Bids as samples, he earned points in his ZeekRewards VIP ProfitPoint balance (Defendant's Response to Plaintiff's

Requests for Admission, paragraph 66). Clearly Defendant herein engaged in  common law

fraud, deceit, or manipulation in connection with the purchase or sale of any security pursuant to

Section § 523(a)(19) of the Bankruptcy Code

Defendant herein knew he was participating in an illegal Ponzi scheme, which had

proven to be tremendously profitable for him – so much so that, looking to maximize his returns,

he used his son's name and Social Security number to open a second ZeekRewards account in

his son's name, along with a bank account at TCF National Bank, where the fraudulent transfers

from ZeekRewards were deposited. *See* Affidavit of Anthony Allyn Simons, attached hereto as

Exhibit "D".  Any argument Defendant may make that he believed he was investing in a valid

business venture is completely negated by his opening of a second account using a different

name and social security number.  This second account was managed solely by Defendant

herein, provided no benefit to his son, and resulted in a judgment being entered against

Defendant's son in the amount of $208,703.78.  *See* Judgment entered Against Anthony Allyn

Simons, attached hereto as Exhibit "G."  Attached hereto as Exhibit "H" is the Statement of

Anthony Allyn Simons, which shows that a total of $436.00 was invested in ZeekRewards under

the name Anthony Allyn Simons and/or EUREKA1, and the net winnings of $155,406.87.

According to the Affidavit of Anthony Allyn Simons, his father, Defendant herein, made all of

the payments to, and received all of the fraudulent transfers from, the account opened under the

name of Anthony Allyn Simons and/or EUREKA1.  Similarly to Defendant's account under his

own name, the Statement attached hereto as Exhibit H shows that under the second account

(Anthony Allyn Simons and/or EUREKA1), Defendant received $130,573.32 in fraudulent

transfers from the RPP "Profit Share," which, as set forth above, operates as a Ponzi scheme.  By

opening a second account using a different name and social security number and using both

accounts to purchase and/or sell securities, Defendant committed common law fraud, deceit or manipulation in connection with the purchase or sale of a security. The Judgment entered against Defendant, along with the Judgment entered against his son – for which Defendant is wholly responsible – should be held nondischargeable in his bankruptcy.

Further, preclusive effect must be given to the finding of actual fraud upon which the Judgment is based. "Section 523(a)(19) alters the normal collateral estoppel rules. It provides that preclusion applies when '*any* judgment, order, consent order, or decree entered in any ... State judicial or administrative proceeding." Frankfurt v. Friedman (In re Friedman), 531 B.R. 741, 746-47 (Bankr. N.D. Ill. 2015) (quoting § 523(a)(19)(B)(i)) (emphasis supplied). The Order granting the Receiver's Motion for Summary Judgment concluded that Defendant's participation in the Ponzi scheme constituted actual fraud. Thus, even were this Court to find that the debt in question is not "for" the violation of a securities law under § 523(a)(19)(A)(i), it is a debt for "common law fraud, deceit, or manipulation in connection with the purchase or sale of any security." *See* Id. at 747.

3. Legislative history and public policy support a finding that proceeds from an illegal Ponzi scheme be declared nondischargeable.

The legislative history supports a broad interpretation of section 523(a)(19), which was added to the Bankruptcy Code by § 803 of the Sarbanes-Oxley Act of 2002. Pub. L. No. 107-24, 116 Stat. 745. This nondischargeability section was added to the Bankruptcy Code in the wake of the Enron and other corporate scandals in order "to make judgments and settlements based upon securities law violations nondischargeable, *protecting victims ability to recover their losses*." In re Chan, 355 B.R. 494, 503 (Bankr. E.D. Pa. 2006) (emphasis added) (citing 148 Cong. Rec. S1787 (daily ed. March 12, 2002) (statement of Senator Leahy)). "[I]t is entirely

consistent with the Act to treat as nondischargeable any debts that arose from violations of

federal or state securities laws, regardless of whether or not the debtor was personally involved

in those violations.  Indeed, *to hold otherwise would result in a windfall to the debtor*."  Wilcox,

at 1183 (emphasis added).

> Section 4 of this bill would amend the Bankruptcy Code to make judgments and
> settlements based upon securities law violations non-dischargeable, protecting
> victims ability to recover their losses.  Current bankruptcy law may permit such
> wrongdoers to discharge their obligations under court judgments or settlements
> based on securities fraud and other securities violations.  *This loophole in the
> law should be closed to help defrauded investors recoup their losses and to hold
> accountable those who perpetrate securities fraud after a government unit or
> private suit results in a judgment or settlement against the wrongdoer.*

In re Hill, 495 B.R. 646, 652 (Bankr. D.N.J. 2013) (emphasis in original) (citing 148 Cong. Rec.

S1783-01, *S1787 (daily ed. March 12, 2002) (statement of Sen. Leahy)).  Allowing the

Defendant to keep ill-gotten gains from his participation in a massive Ponzi scheme is contrary

to the aims of the policy behind the statute.

Securities laws are grounded in the SEC's ability to compel the disgorgement of illegal

proceeds in order to compensate injured victims.

> Disgorgement plays a central role in the enforcement of the securities laws.  The
> effective enforcement of the federal securities laws requires that the
> Commission be able to make violations unprofitable.  The deterrent effect of a
> Commission enforcement action would be greatly undermined if securities law
> violators were not required to disgorge illicit profits.  By deterring violations of
> the securities laws, disgorgement actions further the Commission's public policy
> mission of protecting investors and safeguarding the integrity of the markets.
> Although the Commission at times may use the disgorged proceeds to
> compensate injured victims, this does not detract from the public nature of
> Commission enforcement actions: the touchstone remains the fact that public
> policies are served and the public interest is advanced by the litigation.

SEC v. Gemstar-TV Guide Int'l, Inc., 401 F.3d 1031, 1047 (9th Cir.2005) (quoting SEC v. Rind,

991 F.2d 1486, 1491-92 (9th Cir.1993) (citations, internal quotations, and alterations omitted));

*see also* In re D'Angelo, 409 B.R. 296, 298 (Bankr. D.N.J. 2009) ("Bankruptcy should not be a

haven for wrongdoers.  The fact that this debtor is not a wrongdoer, but allegedly the recipient of

financial benefit from the fraud, does not alter the analysis that a disgorgement remedy fosters

the public purpose behind the state's securities law.).  The interplay between securities and

bankruptcy policy was eloquently expressed in the dissent in *Sherman*.

> Disgorgement is an equitable remedy for fraud, based on the truism that the
> violator has no right to retain the funds illegally taken from the victims.  The
> remedy is designed to deprive a wrongdoer of unjust enrichment, and to deter
> others from violating securities laws by making violations unprofitable.  The
> SEC's efforts to deter securities violations would be greatly undermined if
> securities law violators were not required to disgorge illicit profits.  Accordingly,
> where the ill-gotten gains are held by a third-party in a subordinate or possessory
> capacity, the SEC may name [such] a non-party depository as a nominal
> defendant to effect full relief in the marshalling of assets that are the fruit of the
> underlying fraud.
>
> …
>
> Critically, a nominal defendant by definition has no legitimate claim to the
> disputed property, and is joined purely as a means of facilitating collection. …
> A nominal defendant's lack of legitimate claim to the money subject to
> disgorgement has powerful consequences in bankruptcy.  If a debtor does not
> own an equitable interest in property ... [it] is not property of the estate, and
> therefore is not available for creditors. … The majority thus frustrates the SEC's
> enforcement efforts based on a hollow policy argument; payment of the
> disgorgement judgment would not in fact harm an honest debtor's "fresh start."
> An honest debtor has nothing to fear from a disgorgement judgment - the money
> owed is shielded from creditors; and he has nothing to gain from a discharge -
> he has no right to do anything with the money other than disgorge it.

Sherman, at 1021-23 (internal citations and quotations omitted).  "The 'winners' in the Ponzi

scheme, even if innocent of any fraud themselves, should not be permitted to 'enjoy an

advantage over later investors sucked into the Ponzi scheme who were not so lucky.'"  Donell v.

Kowell, 533 F.3d 762, 770 (9th Cir. 2008) (quoting In re United Energy Corp., 944 F.2d 589, 596

(9th Cir. 1991)); *see also* Bell v. Disner, 2014 WL 6978690, at *8 ("Defendants received the

funds from an admitted Ponzi and pyramid scheme, and … the funds are nothing more than other

people's money wrongfully diverted from RVG.  Therefore, Defendants have received property

which they 'ought not, in equity and good conscience, hold and enjoy.'") (citation omitted).

When examined in whole, Defendant invested a total of $3,282.20 in ZeekRewards

between his own account and the account he opened using his son's name and social security

number.  His "investments" resulted in total winnings between the two accounts of $308,922.61,

with net winnings totaling $297,601.16 – in a period of just *fourteen months*.  Defendant admits

he purchased and sold bids as part of his involvement with ZeekRewards, as part of the RPP

Profit Share that operated as a Ponzi scheme; indeed, in order to receive funds from the RPP

Profit Share, he was required to buy bids (Defendant's Responses to Plaintiff's Requests for

Admission, paragraph 70).  He also admits he did not review any of Rex Venture Group, LLC

d/b/a [www.ZeekRewards.com](http://www.ZeekRewards.com)'s financial statements (balance sheet, profit and loss statement,

income statement, statement of cash flows, etc.) or state or federal income tax returns prior to

making his investment in the ZeekRewards program. (Defendant's Responses to Plaintiff's

Requests for Admission, paragraph 19), and did not request any of Rex Venture Group, LLC

d/b/a [www.ZeekRewards.com's](http://www.ZeekRewards.com's)  financial information. (Defendant's Responses to Plaintiff's

Requests for Admission, paragraph 25).  He did no research at all into Zeekrewards – research

that may well have revealed the true nature of the scheme.  (Defendant's Responses to Plaintiff's

Interrogatories, paragraph 11).   Defendant participated in Rex Venture Group, LLC d/b/a

www.ZeekRewards.com because it promoted a lucrative "compensation plan" and offered large

amounts of passive income to entice individuals to participate in the scheme. (Defendant's

Responses to Plaintiff's Requests for Admission, paragraph 72). Defendant was advised by Rex Venture Group, LLC d/b/a www.ZeekRewards.com of words and phrases to say, including "You make a purchase and repurchase; You earn bids; The bids retire on a 90 day timeline averaging 1.5% a day; You get cash rewards; Retail Profit Pool; Everyone is an Affiliate and they own business center subscriptions; Your Bid balance can increase as oppose to mature." (Defendant's Responses to Plaintiff's Requests for Admission, paragraph 74). Defendant participated in Rex Venture Group, LLC d/b/a www.ZeekRewards.com because of the promise of a return on the funds he paid into the scheme. (Defendant's Responses to Plaintiff's Requests for Admission, paragraph 75).

Defendant herein knew full well he was participating in an illegal Ponzi scheme.  He may have chosen to turn a blind eye to the illegality of the scheme given that it proved to be immensely profitable for him.  He admits that he participated because it was financially profitable for him, so much so that he chose to use his son's name and social security number to create a second account that was managed solely by Defendant, and from which he received all of the fraudulent transfers from ZeekRewards.  He then admits to using the bankruptcy system in an attempt to discharge his personal liability on the judgment against him, now held by Nationwide Judgment Recovery, Inc. (Defendant's Responses to Plaintiff's Requests for Admission, paragraph 27).  Here, the Debtor will be unjustly enriched should he be allowed to discharge the Judgment that resulted from his participation in a massive Ponzi scheme. Bankruptcy should not be utilized as a vehicle by which this Debtor can discharge his personal liability on the Judgment obtained as a result of his own fraudulent activity and which resulted in his unjust enrichment.

The fact is that the real victims, or "losers" of the ZeekRewards scheme, will never be made whole.  Allowing this Defendant to benefit at the victims' expense is contrary to the aims of securities and bankruptcy policy.  As such, Defendant's debt – under both his own account and that of his son - for the violation of securities law or common law fraud, deceit, or manipulation in connection with the purchase or sale of any security, as memorialized in a judgment, should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(19).  "The aim of third-party securities liability is deterrence - limiting the damage that results from securities violations by giving third parties an incentive to put a stop to them before losses mount.  Thus, third-party securities violation debts should be nondischargeable in bankruptcy."  Hillel Nadler, *I Didn't Do It: Third-Party Debtors and the Securities Law Violation Exception to Discharge*, 80 The Univ. of Chicago Law Review 1921, 1923 (2013).

### III.  CONCLUSION

The Defendant was a participant in one of the largest Ponzi schemes in modern day history.  Chasing the unrealistic promise 125% returns, Defendant invested early enough that he was one of a few "winners" of the scheme, resulting in a net profit of $142,194.29 from the account he opened in his own name, and a net profit of $155,406.87 from the account he operated in his son's name.  It is said that bankruptcy law is meant to protect the "honest but unfortunate" debtor, and while the Defendant might be honest in the sense that he was not the architect of the ZeekRewards scheme, he certainly is not unfortunate, and most definitely not innocent.  He walked away with nearly $300,000.00 in net profits in a period of just 14 months, knowing well that he was participating in an illegal Ponzi scheme.  Millions of others were not so fortunate, and will never be made whole.  To allow the Defendant to enjoy a windfall at the expense of the victims in this case is contrary to the express language of the statutes, the purpose

behind the laws, and public policy.  Defendant's Motion for Summary Judgment must be denied.

As such, the debt represented by the Defendant's Judgment must be determined to be

nondischargeable pursuant to 11 U.S.C. § 523(a)(19).  Defendant's Motion for Summary

Judgment should be denied, and Summary Judgment should be granted for Plaintiff pursuant to

Rule 56(f)(1) of the Federal Rules of Civil Procedure, made applicable in this Adversary

Proceeding by Federal Rule of Bankruptcy Procedure 7056.

.

                                         Respectfully submitted,
                                         Attorney for Plaintiff

Dated: 7/23/2021           By:    */s/ Jonathon D. Nelson*
                                        Jonathon D. Nelson, Bar #0399359
                                        Gurstel Law Firm, P.C.
                                        6681 Country Club Drive
                                        Golden Valley, MN  55427
                                        Telephone: (763) 267-6700
                                        Facsimile: (763) 267-6777
                                        Email: j.nelson@gurstel.com

**BELL v. DISNER, Case No. 3:14-cv-91**

**FINAL JUDGMENT**

In accordance with the Court's Order Granting Entry of Final Judgment Against Certain Net Winner Class Members, Final Judgment is hereby entered against Defendant **SCOTT SIMONS** in the amount of **$190,959.94** which is comprised of $142,194.29 in net winnings from the ZeekRewards scheme and $48,765.65 in prejudgment interest.    Post-judgment interest shall accrue on the total amount of this Judgment, including prejudgment interest, at the rate specified under 28 U.S.C. § 1961 from the date of entry of this Judgment until paid in full.

**EXHIBIT A**

According to the records of Rex Venture Group, LLC, and other related information, the "net winnings" of Scott Simons are $142,194.29 determined as follows:

| | | Cash Paid In (a) | | | Commission Payments (b) | | | | Net Winnings (c = (b - a)) |
|---|---|---|---|---|---|---|---|---|---|
| Date | Username | Bid Purchases | Subscription Payments | Total | RPP "Profit Share" | Non-Subscription Matrix Payment | Subscription Matrix Payments | Total | |
| 3/16/2011 | ZEEKREWARD | $ - | $ 10.00 | $ 10.00 | $ - | $ - | $ - | $ - | $ (10.00) |
| 4/16/2011 | ZEEKREWARD | $ - | $ 10.00 | $ 10.00 | $ - | $ - | $ - | $ - | $ (10.00) |
| 4/18/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 108.10 | $ - | $ - | $ 108.10 | $ 108.10 |
| 5/2/2011 | ZEEKREWARD | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 5/23/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 180.57 | $ - | $ - | $ 180.57 | $ 180.57 |
| 5/30/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 166.05 | $ - | $ - | $ 166.05 | $ 166.05 |
| 6/4/2011 | ZEEKREWARD | $ - | $ 97.80 | $ 97.80 | $ - | $ - | $ - | $ - | $ (97.80) |
| 6/6/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 223.29 | $ - | $ - | $ 223.29 | $ 223.29 |
| 6/13/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 32.48 | $ - | $ - | $ 32.48 | $ 32.48 |
| 6/20/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 82.45 | $ - | $ - | $ 82.45 | $ 82.45 |
| 6/27/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 202.42 | $ - | $ - | $ 202.42 | $ 202.42 |
| 7/2/2011 | ZEEKREWARD | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 7/4/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 191.37 | $ - | $ - | $ 191.37 | $ 191.37 |
| 7/11/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 142.25 | $ - | $ - | $ 142.25 | $ 142.25 |
| 7/18/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 216.39 | $ - | $ - | $ 216.39 | $ 216.39 |
| 7/25/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 244.74 | $ - | $ - | $ 244.74 | $ 244.74 |
| 8/1/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 212.58 | $ - | $ - | $ 212.58 | $ 212.58 |
| 8/6/2011 | ZEEKREWARD | $ - | $ 69.65 | $ 69.65 | $ - | $ - | $ - | $ - | $ (69.65) |
| 8/8/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 407.77 | $ - | $ - | $ 407.77 | $ 407.77 |
| 8/15/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 494.24 | $ - | $ - | $ 494.24 | $ 494.24 |
| 8/22/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 461.20 | $ - | $ - | $ 461.20 | $ 461.20 |
| 8/29/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 505.06 | $ - | $ - | $ 505.06 | $ 505.06 |
| 9/3/2011 | ZEEKREWARD | $ - | $ 75.18 | $ 75.18 | $ - | $ - | $ - | $ - | $ (75.18) |
| 9/5/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 305.16 | $ - | $ - | $ 305.16 | $ 305.16 |
| 9/12/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 428.94 | $ - | $ - | $ 428.94 | $ 428.94 |
| 9/19/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 494.64 | $ - | $ - | $ 494.64 | $ 494.64 |
| 9/26/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 517.15 | $ - | $ - | $ 517.15 | $ 517.15 |
| 10/3/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 633.40 | $ - | $ - | $ 633.40 | $ 633.40 |
| 10/8/2011 | ZEEKREWARD | $ - | $ 72.50 | $ 72.50 | $ - | $ - | $ - | $ - | $ (72.50) |
| 10/10/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 681.51 | $ - | $ - | $ 681.51 | $ 681.51 |
| 10/17/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 673.97 | $ - | $ - | $ 673.97 | $ 673.97 |
| 10/24/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 909.78 | $ - | $ - | $ 909.78 | $ 909.78 |
| 10/31/2011 | ZEEKREWARD | $ 33.00 | $ - | $ 33.00 | $ 901.37 | $ - | $ - | $ 901.37 | $ 868.37 |
| 11/5/2011 | ZEEKREWARD | $ - | $ 43.07 | $ 43.07 | $ - | $ - | $ - | $ - | $ (43.07) |
| 11/7/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 1,139.17 | $ - | $ - | $ 1,139.17 | $ 1,139.17 |
| 11/12/2011 | ZEEKREWARD | $ 33.00 | $ - | $ 33.00 | $ 1,198.69 | $ - | $ - | $ 1,198.69 | $ 1,198.69 |
| 11/13/2011 | ZEEKREWARD | $ 33.00 | $ - | $ 33.00 | $ - | $ - | $ - | $ - | $ (33.00) |
| 11/14/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 1,327.09 | $ - | $ - | $ 1,327.09 | $ 1,327.09 |
| 11/15/2011 | ZEEKREWARD | $ 130.00 | $ - | $ 130.00 | $ - | $ - | $ - | $ - | $ (130.00) |
| 11/21/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 1,198.69 | $ - | $ - | $ 1,198.69 | $ 1,198.69 |
| 11/22/2011 | ZEEKREWARD | $ 130.00 | $ - | $ 130.00 | $ - | $ - | $ - | $ - | $ (130.00) |
| 11/23/2011 | ZEEKREWARD | $ 130.00 | $ - | $ 130.00 | $ - | $ - | $ - | $ - | $ (130.00) |
| 11/25/2011 | ZEEKREWARD | $ 130.00 | $ - | $ 130.00 | $ - | $ - | $ - | $ - | $ (130.00) |
| 11/26/2011 | ZEEKREWARD | $ 260.00 | $ - | $ 260.00 | $ - | $ - | $ - | $ - | $ (260.00) |
| 11/28/2011 | ZEEKREWARD | $ 65.00 | $ - | $ 65.00 | $ 1,406.52 | $ - | $ 29.30 | $ 1,435.82 | $ 1,370.82 |
| 12/3/2011 | ZEEKREWARD | $ - | $ 56.00 | $ 56.00 | $ - | $ - | $ - | $ - | $ (56.00) |
| 12/5/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 375.20 | $ - | $ - | $ 375.20 | $ 375.20 |
| 12/12/2011 | ZEEKREWARD | $ 260.00 | $ - | $ 260.00 | $ 1,306.51 | $ - | $ - | $ 1,306.51 | $ 1,046.51 |
| 12/13/2011 | ZEEKREWARD | $ 260.00 | $ - | $ 260.00 | $ - | $ - | $ - | $ - | $ (260.00) |
| 12/16/2011 | ZEEKREWARD | $ 260.00 | $ - | $ 260.00 | $ - | $ - | $ - | $ - | $ (260.00) |
| 12/18/2011 | ZEEKREWARD | $ 390.00 | $ - | $ 390.00 | $ - | $ - | $ - | $ - | $ (390.00) |
| 12/19/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 1,781.57 | $ - | $ - | $ 1,781.57 | $ 1,781.57 |
| 12/26/2011 | ZEEKREWARD | $ - | $ - | $ - | $ 1,032.29 | $ - | $ - | $ 1,032.29 | $ 1,032.29 |
| 1/2/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 1,063.90 | $ - | $ - | $ 1,063.90 | $ 1,063.90 |
| 1/5/2012 | ZEEKREWARD | $ 100.00 | $ - | $ 100.00 | $ - | $ - | $ - | $ - | $ (100.00) |
| 1/9/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 1,183.08 | $ - | $ - | $ 1,183.08 | $ 1,183.08 |
| 1/16/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 1,637.31 | $ - | $ - | $ 1,637.31 | $ 1,637.31 |
| 1/23/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 1,939.00 | $ - | $ - | $ 1,939.00 | $ 1,939.00 |
| 1/30/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 2,485.49 | $ 500.00 | $ 32.70 | $ 3,018.19 | $ 3,018.19 |
| 2/6/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,371.90 | $ 88.40 | $ - | $ 3,460.30 | $ 3,460.30 |
| 2/13/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,646.10 | $ - | $ - | $ 3,646.10 | $ 3,646.10 |
| 2/20/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,231.98 | $ - | $ - | $ 3,231.98 | $ 3,231.98 |

**EXHIBIT B**

| | | Cash Paid In | | | Commission Payments | | | | c = (b - a) |
| Date | Username | Bid Purchases | Subscription Payments | Total | RPP "Profit Share" | Non-Subscription Matrix Payment | Subscription Matrix Payments | Total | Net Winnings |
|---|---|---|---|---|---|---|---|---|---|
| 2/27/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,313.93 | $ 103.08 | $ - | $ 3,417.01 | $ 3,417.01 |
| 3/5/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,053.10 | $ 140.00 | $ - | $ 3,193.10 | $ 3,193.10 |
| 3/12/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 4,216.24 | $ 84.00 | $ - | $ 4,300.24 | $ 4,300.24 |
| 3/19/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,578.71 | $ 136.00 | $ - | $ 3,714.71 | $ 3,714.71 |
| 3/26/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 4,120.56 | $ 94.50 | $ - | $ 4,215.06 | $ 4,215.06 |
| 4/2/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 4,234.80 | $ - | $ - | $ 4,234.80 | $ 4,234.80 |
| 4/9/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 4,174.00 | $ - | $ - | $ 4,174.00 | $ 4,174.00 |
| 4/16/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,886.30 | $ - | $ - | $ 3,886.30 | $ 3,886.30 |
| 4/23/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 4,134.52 | $ 216.20 | $ - | $ 4,350.72 | $ 4,350.72 |
| 4/30/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 3,578.29 | $ 171.00 | $ - | $ 3,749.29 | $ 3,749.29 |
| 5/7/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 243.05 | $ - | $ 170.40 | $ 413.45 | $ 413.45 |
| 5/14/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 2,981.00 | $ 170.80 | $ - | $ 3,151.80 | $ 3,151.80 |
| 5/21/2012 | ZEEKREWARD | $ - | $ - | $ - | $ - | $ 90.60 | $ - | $ 90.60 | $ 90.60 |
| 5/28/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 1,955.48 | $ 52.00 | $ - | $ 2,007.48 | $ 2,007.48 |
| 6/11/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 85.25 | $ - | $ - | $ 85.25 | $ 85.25 |
| 6/18/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 474.00 | $ 2,758.54 | $ - | $ 3,232.54 | $ 3,232.54 |
| 7/2/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 10,905.78 | $ - | $ - | $ 10,905.78 | $ 10,905.78 |
| 7/6/2012 | ZEEKREWARD | $ - | $ - | $ - | $ - | $ 107.80 | $ - | $ 107.80 | $ 107.80 |
| 7/9/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 8,664.87 | $ 765.90 | $ - | $ 9,430.77 | $ 9,430.77 |
| 7/16/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 7,942.78 | $ 174.00 | $ - | $ 8,116.78 | $ 8,116.78 |
| 7/23/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 8,267.19 | $ 337.60 | $ - | $ 8,604.79 | $ 8,604.79 |
| 7/26/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 7,950.89 | $ 50.00 | $ - | $ 8,000.89 | $ 8,000.89 |
| 7/27/2012 | ZEEKREWARD | $ - | $ - | $ - | $ - | $ 24.50 | $ - | $ 24.50 | $ 24.50 |
| 7/30/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 8,579.44 | $ 258.90 | $ - | $ 8,838.34 | $ 8,838.34 |
| 8/14/2012 | ZEEKREWARD | $ - | $ - | $ - | $ - | $ 50.00 | $ - | $ 50.00 | $ 50.00 |
| 8/15/2012 | ZEEKREWARD | $ - | $ - | $ - | $ 5,833.11 | $ 218.30 | $ - | $ 6,051.41 | $ 6,051.41 |
| **Total** | | **$ 2,214.00** | **$ 632.20** | **$ 2,846.20** | **$ 139,715.97** | **$ 6,592.12** | **232.40** | **$ 146,540.49** | **$ 143,694.29** |

Net Activity: **$ 143,694.29**
Less NxPay Frozen Funds: **$ -**
Less Additional Purchases: **$ 1,500.00**

Net Winnings: **$ 142,194.29**

Scott Simons - 2 of 2

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14CV91

| | | |
|---|---|---|
| KENNETH D. BELL, in his capacity as a court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| TODD DISNER, in his individual capacity and in his Capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER; RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court upon the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class. The matter is fully briefed and ripe for consideration.

## I.    FACTUAL BACKGROUND AND UNDISPUTED FACTS

### A. Procedural History of the SEC Action and this Litigation

This "clawback" litigation was initiated by the Receiver of Rex Venture Group, LLC ("RVG"), a Nevada limited liability company with its former principal place of business in Lexington, North Carolina. The Complaint alleges as follows: Paul Burks, the owner and former top executive of RVG, and other management insiders used RVG in their operation of a

1

**EXHIBIT C**

massive Ponzi and pyramid scheme through ZeekRewards ("Zeek") from at least January 2011 until August 2012. Compl. at ¶¶ 1, 6–9. Over 700,000 participants lost over $700 million dollars in the scheme. *Id.* at ¶ 1. Burks and the management insiders used ZeekRewards to promise substantial payouts and outsize returns to all participants, but few actually benefitted. *Id.* at ¶ 2. Those who did benefit were paid not with profits from a legitimate retail operation, but rather from money paid in by later investors in the scheme.  *Id.* at ¶ 3.  The largest "net winners" (those who received more money from Zeek than they paid in to Zeek) each received well over a million dollars, and many others received hundreds of thousands of dollars. *Id*. at ¶¶ 2, 12–25.

On August 17, 2012, the Securities and Exchange Commission filed an action in this Court, *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action"), to obtain injunctive and monetary relief against Paul Burks, shut down the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek appointment of a Receiver for RVG. *Id.* at ¶ 26. Also on August 17, RVG, through Burks, admitted to this Court's jurisdiction over RVG and the subject matter of the SEC action, and it consented to entry of judgment in favor of the SEC. *SEC Action*, Doc. No. 5 at ¶¶ 1–2. As a result, the Court entered consent judgments against RVG and Burks enjoining them from violating the federal securities statutes or participating in, or facilitating, the solicitation of any investment in any security or in the offering of a security. *SEC Action*, Doc. Nos. 6, 8.

That same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court appointed Kenneth D. Bell as the Receiver over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a www.ZeekRewards.com and its subsidiaries and any businesses or business

names under which it does business (the "Receivership"). Compl. at ¶ 27. The Order authorized

and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the

avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and

any other legal and equitable relief that the Receiver deems necessary and appropriate to

preserve and recover RVG's assets for the benefit of the Receivership Estate. *Id.* Within 10 days

of his reappointment on December 4, 2012, the Receiver filed the original Complaint and Agreed

Order in the SEC Action in all of the United States District Courts pursuant to 28 U.S.C. § 754

giving this Court jurisdiction over RVG's property in every federal district.[1]

The Receiver filed this clawback action on February 28, 2014, asserting claims of relief

against Defendants for: (1) Fraudulent Transfer of RVG Funds in Violation of the North Carolina

Uniform Fraudulent Transfer Act ("NCUFTA"); (2) Common Law Fraudulent Transfer; and (3)

Constructive Trust.  Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1)(A) and (B),

the Receiver moved on July 30, 2014 to certify a defendant class consisting of all persons or

entities who were "Net Winners" in ZeekRewards in an amount in excess of one thousand

dollars ($1,000) (the "Net Winner Class").[2] *See* Doc. No. 68. Net Winner Class members are

defined as those ZeekRewards participants who received more money from RVG/ZeekRewards

(as "profit payments," "commissions," "bonuses" or any other payments) than was paid in to

RVG/ZeekRewards for the purchase of "bids," monthly "subscriptions," "memberships," or

other fees. Each of the named Defendants in this action won in excess of $900,000 (either

---

[1] This Court has previously ruled that the Receiver has standing to bring the claims asserted against the Defendants and this Court has subject matter jurisdiction over this action and personal jurisdiction over the Defendants. *Order dated December 9, 2014* (Doc. No. 90).

[2] Excluded from the Net Winner Class in this action were persons or entities that have entered into a settlement agreement approved by this Court or who resided outside the United States at the time of their participation in ZeekRewards.

3

**EXHIBIT C**

individually or together with another family member or through their shell corporation). Compl.
at ¶ 2.

In February 2015, this Court certified the Net Winner Class under both Rule 23(b)(1)(A)
and (b)(1)(B), noting that "the efficiency of one action in which all parties can argue their case
and assert their rights will benefit both the Receiver and small winners," consistent with the
intent of the rules permitting class actions. *See* Doc. No. 101. The common class questions to be
resolved with respect to the Net Winner Class include "whether ZeekRewards operated as a
Ponzi and/or pyramid scheme" and "whether the payments from ZeekRewards to class members
are fraudulent transfers that must be disgorged and repaid." *Id*. at 4-5. On September 14, 2015,
the Court appointed Kevin Edmundson as class counsel and subsequently the Court authorized
the Defendant Class to engage an expert witness, Berkeley Research Group ("BRG"), at the
primary expense of the Receivership.

**B. The Ponzi Scheme**

Beginning at least as far back as 2000, Paul Burks operated a number of generally
unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related
entities).  In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items
ranging from personal electronics to cash were auctioned to bidders.  A "penny auction" does not
work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price
rises based on the amount of the bid until there is no higher bid or the amount of time set for the
auction expires. In a "penny auction," bids must be purchased by bidders (e.g., for $1 per bid),
and each incremental bid placed raises the amount of the total price of the auction item only by
$0.01. Penny auctions have a timer, but unlike a typical auction, each new bid at the end of the
timer resets the bid clock, usually for 30 seconds to a minute. The penny auction ends when the

**EXHIBIT C**

bid clock expires with no new bid. The winner then pays the auction price (plus the cost of bids used), which is typically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

During 2010, the Zeekler penny auctions were not very successful. RVG's fortunes changed in 2011 when RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." Bell Aff. at Ex. 4.  In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It purported to pay a portion of the alleged "profits" from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. RVG told potential participants that "Zeekler tallies total sales and pays a percentage to all active ZeekRewards members." *Id*. at Ex. 5. Also, participants in ZeekRewards, called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

Bidders on the Zeekler penny auctions could purchase bids at retail for $0.65, or they could acquire bids as ZeekRewards affiliates (or as free samples from RVG or an affiliate). ZeekRewards affiliates paid $1 for what RVG variously referred to as "compounding," "sample" or "VIP" bids. The retail bids and the compounding / sample / VIP bids all had the same effect in the auctions – placing a bid raised the price of an auction item by one cent. However, bids bought through ZeekRewards rather than as retail bids were more valuable because purchasing those bids gave the affiliates "points" that supposedly entitled Affiliates to a portion of the profits from the business. This was the real (and only) reason Affiliates would pay $1 for auction bids they could buy for $.65. *See* Brockett Dep. at 77-78.

Further, ZeekRewards made clear that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket.*") (emphasis added). Bell Aff. at Ex. 7. Not surprisingly, even though a largely bogus "bid giveaway requirement" was added later in the scheme, relatively few ZeekRewards participants or "bid giveaway" recipients used their sample/VIP bids in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids created – less than 1/3 of 1%. *See*, *e.g.*, *Id*. at Ex. 8.

From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program. Quickly, RVG's focus changed from Zeekler to ZeekRewards, which was the source of nearly all the company's income. Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business.

The sale of compounding / sample / VIP bids in ZeekRewards dwarfed the sale of "retail" bids. According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold. *See* Turner Report at 8. While over $400 million dollars was paid out to ZeekRewards Affiliates over the course of the scheme, the money used to fund ZeekRewards' distributions to Affiliates came almost entirely from new participants rather than income from the Zeekler penny auctions. *Id*. at Exhibit E. Only about $10 million dollars in retail bids were sold (of which $2.3 million reflected

6

**EXHIBIT C**

purchases by net losing Affiliates). So, the "profit" from the penny auction business, if there was

any at all, could not have supported even 3% of the total payments made to participants.

Burks and the other Insiders were aware that the payouts to Affiliates would be funded by

new participants rather than retail profits from the penny auctions. Dawn Wright-Olivares

excitedly told Burks early in the scheme, "I think we can blow this OUT together- we've already

attracted a great many big fishes." Bell Aff. at Ex. 4.

ZeekRewards succeeded because it promoted a lucrative "compensation plan," offering

large amounts of passive income to entice individuals to participate in the scheme. The

participants in the ZeekRewards scheme invested money in the scheme by buying so-called

"bids/points," "memberships," "subscriptions," customer names, and other items related to the

scheme. The compensation plan consisted primarily of two components: (1) the "Compounder,"

also known as the "Retail Profit Pool" or "RPP," which supposedly allowed participants to

collectively share up to 50% of Zeek's net retail profits and receive a 125% return on investment;

and (2) the "Matrix," which was a multi-level marketing commission program.

Initially, ZeekRewards promised a 125% return on a passive investment, describing the

program as follows: "What if you found a very simple and quick way to earn 125% profit on the

dollars you spend with us without ever having to sell a thing or recruit a soul?" *Id.* at Ex. 10.

Another pitch touted the income participants would receive: "I found something I believe is

absolutely out of this world . . . it's called the 'Compounder' and "grows income for you by

compounding it daily;" . . . "the new system [lets] you earn every 24 hours and can generate for

you 4 or 5 figures or more per month . . . ." "[I]f you've ever wanted to earn 5 figures or more

monthly, passively, then this is your chance." *Id*. at Ex. 11. Similarly, de Brantes boasted that by

**EXHIBIT C**

participating in ZeekRewards: "Many are currently receiving $2,000 to $3,000 per month PASSIVELY." (emphasis in original). *Id.* at Ex. 12.

Early ZeekRewards participants were told to expect profit shares of .5% to 4% daily. *Id.* at Ex. 10. The first day the Compounder share percentage was allocated to participants was January 20, 2011, and the share percentage was 3.24%. *Id.* at Ex. 13. As the scheme progressed, participants continued to be told to expect large, consistent daily returns. On May 14, 2011, Paul Burks told Michael VanLeeuwen ("Coach Van") that "our goal has always been 1% Mon-Thurs and 1/2% weekends, Fri- Sun. We have always maintained those averages and exceeded them often." *Id.* at Ex. 14.

And, even after counsel advised against publicly promoting a 125% return, RVG continued to tell Affiliates and prospects to expect large returns. For example, de Brantes told an affiliate in July 2011:

> [O]ur average has been between 1.6–1.8% which would actually be a great deal more than 125%. The attorneys our [sic] advising us on what we can and can't say and now it's our job to figure out how much we need to pay daily to get everyone exactly what we intend to give (it makes it a little tricky but it is our intention to maintain a system that pays 125% without saying it anywhere on the site). …Right now we're still working on the 125% cap system. We just aren't saying 125%.

*Id.* at Ex. 15.

Therefore, Affiliates paid and invested money into ZeekRewards with the expectation that they would profit from their payments based on the success of the company's operations. All the income received by ZeekRewards and Zeekler, regardless of source, was pooled and comingled in a cast of financial institutions that changed as the scheme evolved or as financial companies refused to work with RVG.

8

**EXHIBIT C**

Although the specifics and the terminology of the ZeekRewards "Compensation Plan" changed from time to time as Burks and the other Insiders tried to prolong and prop up the scheme, the two pillars of the plan for most Affiliates were always: (1) "profit" sharing (first called the Compounder then later the Retail Profit Pool (or "RPP")) and (2) the multi-level marketing pyramid that paid Affiliates a "commission" on the membership fees paid by recruited "downline" Affiliates (known as the Matrix).

ZeekRewards' Affiliates' primary money making tool was the "Compounder." To participate in the Compounder, Affiliates purchased "compounding" bids, which earned Affiliates one point for each "compounding" bid that they purchased from the company. To become an Affiliate "qualified" to receive points required little or no effort, despite the bogus claim that Affiliates "earned" points. As discussed in more detail below, Affiliates were required to place daily one free digital ad (generally prepared by the company) for Zeekler.com. Later, Affiliates were told they needed to "give away" the bids in order to obtain points, although in practice this so-called "requirement" was easily met: Affiliates could simply pay extra to have the company "give away" the bids for them. *Id*. at Ex.16. In effect this was, in turn, just yet another revenue source for the company.

As the inducement to purchase these "compounding" bids, ZeekRewards told Affiliates that the company would give a portion of the company's daily earnings or profits (often claimed to be 50%) to point-holding Affiliates. The size of the daily "profit sharing" payment each affiliate received through the Compounder was based upon the number of points the affiliate held in his or her account. The size of each Affiliate's daily award depended only on the Affiliate's point total. Thus, regardless of the Affiliates' efforts, buying more points resulted in a larger profit share, just like having more shares of stock results in a larger dividend for a stockholder.

9

**EXHIBIT C**

ZeekRewards described the "Compounder" process as follows: "At the end of each business day (7 days a week) the company determines its daily overall profitability and rebates a percentage back to its Active Advertising Affiliates based on each individual Premium Members Compounder Bid Balance." *Id*. at Ex. 4. Each day, affiliates had a choice to be paid all or a portion of the so-called "profit" award in cash or to use the "cash" award to buy more bids/points, which then added to the bid / points balance and "compounded" as the daily percentage awards were made. Burks and the other insiders understood that the compensation plan would be unsustainable in both the short run and the long run because there would not be enough new participants to support full daily cash payments to a growing number of existing Affiliates. *See*, *e.g.*, Turner Report at Exhibit G, p.15.

Prior to the shutdown of ZeekRewards, there were over 3 billion VIP bid points in the ZeekRewards system. *See Id*.  Based on the actual average daily "profit" percentage of 1.43% used during the scheme, the daily "profit" award to Affiliates would be over $40,000,000 on 3 billion points. The amount of money paid in to ZeekRewards daily was far less than $40 million. Therefore, if RVG had been required to pay the daily awards supposedly available to Affiliates in cash, ZeekRewards would have quickly collapsed. Specifically, during the last month ZeekRewards operated (July 16, 2012 to August 15, 2012) the daily average RPP award purportedly available to participants was $38,237,036, but the daily receipts (from all sources, not just retail auctions) were much smaller, averaging approximately $9,722,000. *See Id*.  Thus, not only were the ZeekRewards payouts made from the money put in by other participants, but the so-called "profit" awards greatly exceeded total receipts, which, of course, was unsustainable.

10

**EXHIBIT C**

To maintain the program for as long as possible and generate the most income, ZeekRewards actively discouraged Affiliates from requesting actual payment of all their profit awards in cash. Instead, Affiliates were encouraged to let their balances "compound" and only take 20% or less of their "earnings." Bell Aff. at Ex. 17.

ZeekRewards eventually changed the name of the Compounder to the "Retail Profit Pool," or "RPP." In addition, they changed the name of compounding bids to "VIP bids" or "sample bids." However, while the names changed, the essential nature of the "profit" sharing scheme remained the same. In one email, when referring to compounding bids being renamed VIP bids, Wright-Olivares wrote, "wherever you see a (compounding) next to VIP – you will know that these terms are interchangeable," and she later wrote that "no change has been made in how they operate, qualify or earn." *Id*. at Ex. 18. Indeed, Wright-Olivares admitted that she thought the name changes were a joke. In a June 15, 2011 email to O.H. Brown, an RVG advisor whose company created marketing videos for ZeekRewards, about a company webinar script, she said: "you'll see where I started to say Retail Profit Pool (lol) instead of Compounder…. We're going to call compounding bids – VIP bids." *Id*. at Ex. 19.

Whether called the Compounder or the Retail Profit Pool, the program was a fraud because the payments had no relation to actual "retail" profits nor were they calculated from real receipts or expenses.  Instead, the alleged "profit percentage" was nothing more than an arbitrary number made up by Burks or one of the other Insiders. Most days, Burks made up the number. As Danny Olivares explained to RVG's internet provider, "Paul [Burks] goes in nightly and opens up adm_displayCompunder3.asp and enters a decimal percentage." Id. at Ex. 20. Sometimes, the number was made up by Dawn Wright-Olivares or Danny Olivares.

11

**EXHIBIT C**

Rather than reflecting the typical variances that might be expected in a company's profits, the alleged profits paid in ZeekRewards were remarkably consistent, falling nearly always between 1% and 2% on Monday through Thursday and between .5% and 1% on the weekends, Friday through Sunday. The goal of this fake consistency was to project the appearance of a stable source of income to entice new participants and to encourage existing Affiliates to allow their bid balances to compound rather than request payment of their daily award in cash. And, with RVG's knowledge, Affiliates regularly touted the consistent payments in their recruiting of new participants. For example, "Coach Van's" email footer stated: "It has been going like clockwork for over 220 days, 7 days per week.".... "EVERYONE. . .GETS. . .PAID. . .FIRST. . .DAY!" . . . This works every time with just one minute per day! If you're not getting paid every single day for 1 minute of work, . . . [sic] why not?" . . . "100 percent of our active members are paid daily 100 percent of the time within their first 24 hours without any referrals." *Id*. at Ex. 21.

The payouts were so consistent that when a mistake was made (such as when an extra decimal place was added to the "profit" percentage or the lower "weekend" percentage was used on a "weekday") Affiliates would immediately complain. For example, on August 3, 2012, de Brantes sent Danny Olivares a Skype message saying, the "Thursday [RPP] commission's % are running like a weekend commission % and everyone is going crazy." *Id*. at Ex. 9(c). Olivares replies that, he is "working on it." *Id*.

And, the Insiders realized that not paying Affiliates, even once, was not an option if they wanted to keep the scheme going. On May 20, 2012, there were problems with payments to affiliates. Dawn Wright-Olivares texted Danny Olivares and instructed him to post an update letting affiliates know their payments would eventually be processed and commissions would be

paid, telling him, "[t]he fastest way to get charge [sic] as a Ponzi scheme is for distributors to claim they are not getting paid." *Id*. at Ex. 22.

Burks deliberately evaded affiliate questions asking how the RPP was calculated. In a Skype chat with an affiliate, he said: "[a] proprietary system is used to determine the amount of profit sharing that is done each day. We do not divulge the details of how those numbers are determined. Our stated target of minimum of 1% weekdays (Mon- Thur) and .5% weekends (Fri-Sun) has always been met and exceeded. It is clearly not directly tied to the number of auctions in a particular day. It is the overall average that counts." *Id*. at Ex. 9(d). Behind the scenes, the Insiders were not even subtle about the fake earnings numbers. Often, the company simply used the previous week's daily RPP percentages. For example, on one occasion, Danny Olivares sent a text message to multiple insiders stating, "Need a % for rpp when you can." Dawn Wright-Olivares responded, "Do whatever was last Monday." *Id*. at Ex. 40. Or, from Paul Burks: "Hey Dan. Sorry about last night. What percent did you use?" Danny Olivares: "Same as last Friday. 0.009." *Id*. at Ex. 23.

Sometimes, Burks even told Danny Olivares in advance what a day's profit number would be, such as on September 14, 2011, when in the early morning Burks told him "to start the RPP run shortly after 7p.m. using .00179 as the percentage" because Burks was not going to be able to run it himself. *Id.* at Ex. 24. Even if the Insiders had intended to calculate actual profits (which they plainly did not), RVG did not maintain financial records sufficient to allow Burks or anyone else to calculate a daily retail profit for the company. *See* Turner Report at 7 ("[T] there is no indication that the records existed that could calculate Zeek's daily profit.").

In an unsuccessful effort to avoid the obvious legal infirmity of Affiliates simply buying points in return for the expectation of a share of the profits (like a stock purchase), ZeekRewards

**EXHIBIT C**

told Affiliates that in order to supposedly "earn" their points, they were required to place a short, free digital ad each day on one of the many free classified websites available on the internet. Affiliates were told to merely copy and paste free ads created by ZeekRewards into a free digital classified ad website. Bell Aff. at Ex. 25.

Affiliates then submitted the ad's internet link to ZeekRewards to verify that they had placed the ad. Placing more ads or better ads did not change an Affiliate's share of the profits in any way. And, the ad "requirement" was not imposed on all Affiliates. Burks even wrote a computer program that allowed a number of Affiliates who managed multiple accounts to avoid placing the ads altogether. As Burks wrote in an email to Danny Olivares on January 23, 2011, "This allows us to defer to some of our major people like Agnita Solomon who manage dozens of accounts so that they don'e [sic] have to place so many ads every day." *Id*. at Ex. 26.

The "ad" process was intended to be very simple and was widely advertised as taking only 3-5 minutes each day. For example, Burks routinely told Affiliates: "Placing an ad takes three to five minutes a day and can be done from anywhere there is an Internet connection." *Id*. at Ex. 27. The company did not believe that these digital ads made any material difference in the success of the Zeekler auctions and did no research to determine if the ads were successful. In reality, the ads were just an attempt to manufacture a cover for what was nothing more than the investment of money by Affiliates with the expectation of receiving daily "profit" distributions.

In a further effort to justify the Affiliates' investments of money, beginning in August 2011, ZeekRewards purportedly required Affiliates to "give away" their purchased VIP bids to earn points. *Id*. at Ex. 28, 29. The claimed intent of this "requirement" was to promote use of the auctions by new retail customers who received these free bids. However, Burks and the insiders

14

**EXHIBIT C**

knew that in practice the bid "give away" program (like the free ads) had no material impact on the success of the penny auctions.

First, the company made little or no attempt to determine if bids had in fact been given to legitimate prospective retail customers. Many Affiliates simply listed fake email addresses, addresses of other existing Affiliates or those planning to be affiliates, family members, and other non-productive locations for where the bids had been given away. *Id*. at Ex. 30. In some cases, the company just agreed not to require the affiliate to give away their bids to earn points.

Also, both as a way to minimize any real effort by Affiliates and a way to make more money, Affiliates were given the opportunity to pay to have the company (supposedly) give the bids away on behalf of the affiliate. *Id*. at Ex. 31. Points were earned when the bids were given to the company (supposedly) to be given away. In fact, the company did not find prospective retail customers to whom it could give away all the bids, so millions of bids remained in the company unused. But, ZeekRewards did make an additional $2.00 - $2.50 per customer "sold" to Affiliates. And, because there were alleged limits on the number of bids that could be given away to any one person based on the Affiliate's membership level, tying the "give away" of bids to the accrual of points drove "upgrades" in membership levels which increased revenues even more. *Id*.

Danny Olivares explained the process of how VIP bids were automatically given away to accrue points for Affiliates as follows: After a VIP bid is purchased, the "Company pool automates the process of giving bids away as samples. Giving the bids away as samples is what generates VIP points. Which the rpp uses to calculate your award. So we come full circle." *Id*. at Ex. 32.

15

**EXHIBIT C**

Burks told Affiliates that the company-wide Bid Pool would "take ALL of the sting out of the whole bid-give requirement! . . . [Y]ou will be able to automatically give your bids each day" and "you will automatically receive the VIP points as soon as you receive your daily RPP award each day. . . . All you'll have to do is select the "Give my bids to the Zeek bid pool" option and the system will automatically give your bids to your customers and every customer that registers @ Zeekler.com that wants free bids! If you do not have any customers then you simply purchase them as you need them from the customer co-op, and that will be automated as well!" *Id*. at Ex. 29.

Later, Affiliates were not allowed to simply pay the company to "give away" the bids for them, but they were allowed to pay third parties to do so. *Id.* at Ex. 33. Again, RVG made no effort to determine if these bids were in fact given to legitimate potential retail customers.

The second broad component of the ZeekRewards compensation plan was paying Affiliates to recruit other Affiliates in a pyramid-style payment system. ZeekRewards referred to this system as the "Matrix." The Matrix pyramid was initially a "2x21" matrix in which Affiliates made multi-level marketing commissions for 21 levels down in their "organization." *Id*. at Ex. 34, 35. Later, ZeekRewards used a "2x5 forced-fill matrix," which is a pyramid with 63 positions within the five levels (the number of persons doubles at each successive level). The scheme paid a bonus to Affiliates for every "downline" investor within each affiliate's personal matrix, plus a "matching bonus" for every 5th level where certain qualifiers were met. Therefore, commissions could be earned indefinitely as the pyramid expanded.

To get bonuses through the Matrix, Affiliates just had to (1) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (2) recruit at least two other "Preferred Customers" (i.e., investors who also enrolled in a monthly subscription plan).

**EXHIBIT C**

*Id*. at Ex. 18. Once qualified, affiliates earned bonuses and commissions for every paid subscription within their "downline" pyramid, whether or not they personally recruited everyone within the matrix. Simply put, Affiliates were rewarded merely for recruiting new investors without regard to any efforts by the Affiliates to sell bids or products or otherwise materially support the Zeekler retail business.

The funds raised through the Matrix were commingled with the money raised through the Compounder / Retail Profit Pool (and what little money came in from the retail auction business), so nearly all the money used to pay the pyramid commissions came from other investors in the scheme. While some commissions were available to Affiliates on customers' purchases of retail bids for use in the Zeekler auctions, Affiliates did not need to sell retail bids to customers in order to receive commissions through the Matrix. Furthermore, overall commissions from the sale of retail bids to end-user customers were miniscule (retail bids accounted for only 1.1% of the money paid into the scheme). *See* Turner Report at 8. These retail commissions, referred to by RVG as "Zap Commissions," were merely incidental to the overall commissions earned through the Matrix for downline subscription payments and through the Compounder/RPP.

As with the Compounder, the Insiders changed the terminology for the Matrix, but they never changed the real essence of the scheme. Dawn Wright-Olivares explained the cosmetic changes to the Matrix this way: "you [will] in effect be paid on levels 5-10".... "but we can't SAY that. Deep matrices get shut down. So instead...we say that you are getting a matching bonus on all of the 2x5's on your 5th level. It's semantics, but semantics mean a great deal with regulators." She went on, "[I] don't really understand how they can say they have levels 10, 15, etc. when it's a 2x5, but if we can get away with it this way - then it's my vote to leave it alone."

17

**EXHIBIT C**

Bell Aff. at Ex. 9(e). Similarly, Keith Laggos, a ZeekRewards advisor, emailed Dawn Wright-Olivares (copying Burks) in July 2011: "when talking about matching bonuses, you are showing being paid on 1 to 10, 1 to 15 and 1 to 20 levels. This defeats what we did by going to a 2x5 matrix. You should say a 100% matching on all your 5th, 15th and 20th level affiliates' 2 x 5 matrixes. I know you want to show they get paid on 20 levels in a 2 by 20 matrix, but that is when you can get a pyramid investigation or charge." *Id.* at Ex. 36.

RVG's insiders often worried about being caught and sought to make the unlawful scheme seem legitimate in many ways. As described above, the changing of terminology or the rules of the game, but not the substance of the scheme, was a common practice.

Throughout 2011 and 2012, Burks and the Insiders regularly changed the names of the program elements or demanded that Affiliates stop using certain words, which accurately described the scheme but highlighted its illegality. For example, on July 26, 2011, de Brantes emailed an Affiliate with a list of things the Affiliate can and cannot say, including: "compounder, compound, compounded, compounding, 125%, Members, Interest, Investment, Mature."  On the list of sanitized things the Affiliate could say: "You make a purchase and re-purchase; You earn bids; The bids retire on a 90 day timeline averaging 1.5% a day; You get cash rewards; Retail Profit Pool; Everyone is an Affiliate and they own business center subscriptions; Your Bid balance can increase as oppose to mature." *Id.* at Ex. 37.

Also, RVG employees openly discussed the words that could and could not be used when promoting the scheme, even adding a bit of black humor as the scheme headed towards its inevitable demise. On June 8, 2012, de Brantes and others discussed "training" Affiliates on "the top 10 or 12 words that every Affiliate should erase from their vocabulary". The list included "investment, put money in, roi [return on investment], fund, passive income, passive returns,

**EXHIBIT C**

returns and points are not dollars." In response to this list, Ken Kilby (a supposed "compliance officer") suggested adding: "BBB, Attorney General, FBI, FTC, Report, turn you in." *Id*. at Ex. 38.

Beyond the shifting terminology, Burks and the Insiders tried to bolster the perception of the legitimacy of the scheme by running "Compliance" courses for Affiliates. *Id*. at Ex. 39. As with the advertising or bid give-away "requirements," the "compliance" courses were just an effort to obscure the fraud and wrap it in a cloak of propriety, while making even more money in the process.

After an extensive investigation, the Receiver filed this action. The Complaint asserts claims for violation of the NCUFTA, Common Law Fraudulent Transfer and Constructive Trust. The Receiver seeks Judgment against each of the Named Defendants in the amount of their net winnings from the ZeekRewards scheme. With respect to the Net Winner Class, the Receiver seeks a Declaratory Judgment determining that the net winnings they received were fraudulent transfers from RVG that must be repaid to the Receiver and are subject to a constructive trust for the benefit of the Receivership Estate. Ultimately, the Receiver seeks a final Judgment against each Net Winner Class member in the amount determined to be their net winnings through a process to be set by the Court that provides class members the opportunity to respond to the Receiver's calculation of their net winnings.

## II.    DISCUSSION

Summary judgment should be granted where there is no genuine issue as to any material fact and the "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party opposing summary judgment cannot rely on conclusory allegations, unsubstantiated assumptions or a scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-

**EXHIBIT C**

86 (1986).  Rather, the non-moving party must "set out specific facts showing a genuine issue for trial." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).

Despite engaging a defense expert to investigate the fundamental issue of whether or not ZeekRewards operated as a Ponzi scheme, Defendants have conceded that ZeekRewards was, in fact, a Ponzi scheme.  Nevertheless, Defendants argue that the Court should not grant summary judgment in favor of the Receiver.  The Court will address each of Defendants' arguments below.

Defendants first contend that a one-year limitations provision in ZeekRewards' website's "Terms of Service" ("TOS") bars the Receiver's claims. The TOS provided:

> The TOS along with the Privacy Policy and Purchase/Membership/Affiliate agreement constitute the entire agreement between you and ZeekRewards and govern your use of the Service . . . You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of the Service or the TOS must be filed within one (1) year after such claim or cause of action arose or be forever barred.

Doc. No. 135-2, p. 30.

Defendants' position is that because the Receiver stands in the shoes of RVG, he is bound by the TOS and its limitations provision.  Essentially, Defendants are arguing that a subsequently appointed receiver's fraudulent transfer claims can be barred by the terms under which the scheme was implemented.

Contrary to Defendants' argument, a receiver is not bound by an agreement that the fraudster, "acting with the intent to defraud, signed on behalf of" the company in receivership. *See Hodgson v. Kottke Assocs., LLC*, Civ. Action No. 06-5040, 2007 WL 2234525, at *7 (E.D. Pa. Aug. 1, 2007).  As is readily apparent, it "would create a perverse incentive . . . for a court to rule that a party who fraudulently enters into an agreement subsequently bars a trustee or

20

**EXHIBIT C**

receiver from bringing an action to recover the funds fraudulently transferred pursuant to that agreement." *Id*. If the terms implementing a fraudulent scheme could shorten the limitations period to eliminate or cut off a receiver's claims at an earlier date, a fraudster would have a strong incentive to include a limitations period much shorter than the statutory period (here one year instead of four) as a means to protect investors in his scheme from clawback actions down the road. Indeed, adopting Defendants' position would create a ready-made roadmap for fraudsters to protect anyone who won money in their scheme, thus further encouraging participation and enhancing the scheme. Such a result would undermine a receiver's ability to perform his duties and severely weaken his ability to serve his role as "an instrument of court . . . acting also for the stockholders of the corporation, and the creditors of the corporation." *Drennen v. S. States Fire Ins. Co*., 252 F. 776, 787 (5th Cir. 1918). Accordingly, the Court finds that applicable statutory limitations periods apply in this case and the Receiver's claims are timely filed.

### A. Fraudulent Transfer Claims

The NCUFTA permits a receiver to avoid a transfer made "with the intent to hinder, delay, or defraud any creditor of the debtor" within four years after the transfer was made. *See* N.C. Gen. Stat. §§ 39- 23.4(a)(1) (fraudulent transfers); 39-23.1 (definitions); 39-23.9 (statute of limitations). Many courts have held that the intent to defraud can be presumed when transfers are in furtherance of a Ponzi scheme. The "Ponzi scheme presumption" has been long settled in a number of jurisdictions and under an analogous section of the Bankruptcy Code.

Bankruptcy Code Section 548(a)(1)(A) provides that a trustee may avoid a transfer of an interest of the debtor in property, if the debtor made such transfer with actual intent to hinder, delay, or defraud creditors. 11 U.S.C. § 548(a)(1)(A). A majority of federal courts have held that

**EXHIBIT C**

proof of operation of a Ponzi scheme is sufficient to establish actual intent to hinder, delay, or defraud creditors to permit avoidance of a fraudulent transfer under section 548(a)(1)(A). *See*, *e.g.*, *Gold v. First Tenn. Bank, N.A. (In re: Taneja)*, No. 10-1225, 2012 Bankr. LEXIS 3554, *13-14 (E.D. Va. Jul. 30, 2012).   Transfers in furtherance of a Ponzi scheme "have achieved a special status in fraudulent transfer law" from which intent of actual fraud may be inferred. *In re Cohen*, 199 B.R. 709, 717 (9th Cir. BAP 1996).

Courts in the Receivership context outside bankruptcy also routinely apply the Ponzi scheme presumption to avoid fraudulent transfers. *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014); *Wing v. Dockstader*, 482 Fed. App'x. 361, 363 (10th Cir. 2012);  *see also*, *Warfield v. Carnie*, No. 3:04-cv-0633, 2007 WL 1112591, at *9 (N.D. Tex. Apr. 13, 2007).

The U.S. Bankruptcy Court for the Middle District of North Carolina held that the "Ponzi scheme presumption" of actual fraudulent intent also arises in fraudulent transfer actions brought under N.C. Gen. Stat. § 39-23.4(a)(1). *Ivey v. Swofford (In re Whitley)*, 463 B.R. 775, 781 (Bankr. M.D.N.C. 2012). In reaching its conclusion, the court looked to the interpretation of the Uniform Fraudulent Transfer Act in other jurisdictions, as well as the relevant sections of the Bankruptcy Code. *See Id.* at 782 (citing *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008); *In re Mortg. Store, Inc.*, Slip Copy, 2011 WL 3878355, at *2 (Bankr. D. Hawaii Sept. 1, 2011); *In re Dreier LLP*, 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011); *PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 Fed.App'x. 839, 847 (3d Cir. 2005); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 365 (S.D. Tex. 2008)).

There is no genuine issue of material fact that ZeekRewards operated as a Ponzi scheme. Accordingly, the law considers transfers from the scheme to be fraudulent transfers that may be avoided under the NCUFTA.

22

**EXHIBIT C**

Defendants argue that regardless of whether RVG had bad intentions, summary judgment should be denied as to this claim because there is a genuine issue of material act as to whether the Defendants acted in good faith and provided "reasonably equivalent value" in return for their net winnings. [3]  Defendants argue that in exchange for the income they received from ZeekRewards, the evidence shows that they directed new customers to the Zeekler.com penny auction site, promoted the auction by placing daily advertisements on the internet, networked with other marketing professionals to gain greater exposure for Zeekler and ZeekRewards, set up websites to drive traffic to Zeekler and ZeekRewards, recruited new customers, and participated in training programs, leadership calls, and mandatory compliance programs.  They liken themselves to "internet marketing specialists" and contend that they provided more than reasonably equivalent value for the payments they received.

Actual participants and investors in a Ponzi scheme cannot establish that they gave "reasonably equivalent value" for their winnings through their efforts participating in and recruiting others to the scheme.  Nearly all the courts that have considered this issue have determined that participants and investors may be entitled to a return of their principal investment, but must return the amount received beyond that investment.  *See*, *e.g.*, *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("In the case of Ponzi schemes, the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."); *see also Wing*, 482 F. App'x at 365-66; *In re AFI Holding, Inc.*, 525 F.3d at 704; *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006); *Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995).[4]  The Ninth

---

[3] N.C. Gen. Stat. § 39-23.8(a) provides an affirmative defense under the NCUFTA to a transferee who acted in good faith *and* provided reasonably equivalent value in exchange for the transfer.
[4] Despite Defendants' suggestion, there is no recent "trend" away from this rule.

23

Circuit has explained one rationale for this rule: "The policy justification is ratable distribution of remaining assets among all the defrauded investors. The 'winners' in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to 'enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.'" *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (quoting *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991)).

Moreover, courts have routinely and specifically held that there is no value in recruiting new investors to a fraudulent scheme. *See*, *e.g.*, *Wing v. Dockstader*, No. 2:08 CV 776, 2010 WL 5020959, at *6 (D. Utah Dec. 3, 2010) ("[T]he court disagrees with the notion that a person paid to refer investors to a ponzi scheme is more akin to the venture's utility provider than the investors."); *In re Nat'l Liquidators, Inc.*, 232 B.R. 915, 919 (Bankr. S.D. Ohio 1998) ("The Trustee has established that the Debtor received less than a reasonably equivalent value, because all that the Debtor received in return for the transfers was the use of the Defendants' money to run the 'ponzi' scheme."); *In re Randy*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995) (holding that "as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers").  The Fifth Circuit has aptly summarized the lack of merit in Defendants' argument, stating "[i]t takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new investments." *Warfield*, 436 F.3d at 560.

Moreover, the cases Defendants cite in support of their argument involve innocent trade creditors or third-parties providing "legitimate" services in the ordinary course of business. Defendants are actual participants/investors in the Ponzi scheme, not third-party service providers.

24

**EXHIBIT C**

The Court finds that here is no genuine issue of material fact that Defendants did not

provide "reasonably equivalent value" for their winnings.[5]  Accordingly, the Court grants

summary judgment in favor of the Receiver on the NCUFTA claim.[6]

### B. Constructive Trust Claim

The Receiver's final claim against the Defendants seeks the imposition of a constructive

trust with respect to any transfer of funds, assets, or property from the Receivership Entities, as

well as any assets later obtained by Defendants using the transferred funds.

> A constructive trust is a duty, or relationship, imposed by courts of equity to
> prevent the unjust enrichment of the holder of title to, or of an interest in,
> property which such holder acquired through fraud, breach of duty or some other
> circumstance making it inequitable for him to retain it against the claim of the
> beneficiary of the constructive trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 751–52 (N.C.

2012) (quoting *Wilson v. Crab Orchard Dev. Co.*, 171 S.E.2d 873, 882 (N.C. 1970)).

The Defendants argue that a constructive trust is only available when a fiduciary

relationship exists and there is no adequate remedy at law.  They also contend that a constructive

trust requires a traceable or identifiable *res*, and the Receiver bears the burden of proving

traceability.

Citing *Variety Wholesalers,* the Receiver correctly points out that a fiduciary relationship

is not required for imposition of a constructive trust.  All that is required under that decision for a

---

[5] Thus there is no reason for the Court to discuss the "good faith" argument of the Defendants, as the affirmative defense requires both good faith and reasonably equivalent value.

[6] In addition to seeking avoidance of fraudulent transfers pursuant to the "actual fraud" provision of the NCUFTA (N.C. Gen. Stat. § 39-23.4(a)(1)), the Receiver's First Claim for Relief also seeks avoidance pursuant to the "constructive fraud" provision of the statute (N.C. Gen. Stat. § 39-23.4 (a)(2)).  The Court finds it unnecessary to discuss this claim given the Court's holding that the transfers herein may be avoided pursuant to § 39-23.4(a)(1).  Likewise, the Court finds it unnecessary to analyze the Receiver's alternative claim for common law fraudulent transfer.

**EXHIBIT C**

constructive trust is an "inequit[y]" or "unconscientious matter." *Id.* at 752.  Here, the Ponzi scheme easily qualifies as inequitable and unconscientious.

Moreover, as this Court has previously noted, Defendants were early adopters of the ZeekRewards scheme and as result, these named Defendants may have already dissipated much of their net winnings. Without a constructive trust it would be impossible for the Receiver to trace and secure these fraudulently transferred Receivership Assets. Thus, the Receiver's remedy at law would be inadequate.

Finally, allowing the lack of traceability to defeat the Receiver's constructive trust claim would create a perverse incentive for every net winner of any Ponzi scheme to spend any proceeds received from the scheme before a receiver could start to unwind it and then claim that the assets were gone.  "In cases involving Ponzi schemes, courts have taken a broad view of the constructive trust remedy, and the tracing requirement, in order to effectuate the goal of returning to the victims of the fraud their stolen property or proceeds of that property." *S.E.C. v. Credit Bancorp, Ltd*., 138 F. Supp. 2d 512, 533 (S.D.N.Y. 2001), *rev'd in part, vacated in part on other grounds*, 297 F.3d 127 (2d Cir. 2002). In *United States v. Benitez*, 779 F.2d 135 (2d Cir. 1985), for example, the Second Circuit held that a constructive trust could be imposed on the assets of a Ponzi scheme, even though those funds were "not traceable." *Id*. at 140; *see also United States v. Schwimmer*, 968 F.2d 1570, 1584 (2d Cir.1992) ("To the extent this Court tolerated a very relaxed tracing standard in *Benitez*, it was with an eye to permitting the District Court to exercise this general, victim-compensation function, without being hampered by strict definitions of property rights.").

Indeed, "[e]quity applies the principles of constructive trusts wherever it is necessary for the obtaining of complete justice . . .." *Speight v. Branch Banking & Trust Co.*, 83 S.E. 734, 736

**EXHIBIT C**

(N.C. 1936).   Imposing a constructive trust under the circumstances herein furthers the

Receiver's ability to recover the assets of the ZeekRewards Ponzi scheme and distribute them to

the net losers, thus making the victims as whole as possible.   Accordingly, summary judgment in

favor of the Receiver is appropriate.

IT IS THEREFORE ORDERED that the Receiver's Motion for Summary Judgment

Against Remaining Named Defendants is hereby GRANTED; and

IT IS FURTHER ORDERED that the Receiver's Motion for Partial Summary Judgment

Against the Net Winner Class as to all liability issues is hereby GRANTED.

Signed:   November   29,

Graham C. Mullen
United States District Judge

27

**EXHIBIT C**

## AFFIDAVIT OF ANTHONY ALLYN SIMONS

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF ANOKA       )

Affiant, Anthony Allyn Simons, does hereby declare, under penalty of perjury, that:

1. Around 2011, my father, Scott Allyn Simons, used my name and social security number to open a ZeekRewards account, with my permission but not for my benefit.

2. Around 2011, my father, Scott Allyn Simons, used my name and social security number to open  a joint bank account at TCF National Bank for the purpose of receiving money from the ZeekRewards account, with my permission but not for my benefit.

3. I did not have any access to the joint bank account at TCF National Bank nor did I use it as my main bank account.

4. I did not have any access to, participate, or manage the ZeekRewards account.

5. After the two accounts were set up, I believe that my father continued to operate the ZeekRewards account in my name and he received any money from ZeekRewards into the joint bank account at TCF National Bank, based upon my personal knowledge that I did not operate the ZeekRewards account and upon my review of the documentation I received from Nationwide Judgment Recovery Inc. showing that the ZeekRewards account was operated.

6. I was not involved in any ZeekRewards account other than noted above.

7. I did not actively or otherwise manage a ZeekRewards account.

8. I did not receive any sum of money directly from ZeekRewards.

## EXHIBIT D

9. My father, Scott Allyn Simons, managed the ZeekRewards account that he set up in my name.

10. My father, Scott Allyn Simons, received any and all sums of money directly from ZeekRewards.

11. My father, Scott Allyn Simons, did give me some of the money that he received directly from ZeekRewards while I was in college, but the total amount given to me was less than ten thousand dollars ($10,000.00) over the course of years.

12. Other than noted above, I did not receive any money from ZeekRewards.

13. I have personal knowledge of all of the facts recited herein, and should I be called to testify to such facts, my testimony would be consistent with this Affidavit.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Dated: _5/28/21_                      Signed: _____

Anthony Allyn Simons

Subscribed and sworn to before me this _28th_
day of _May_____, 20 _21_.

_____
Notary Public

> JENNIFER L NELSON
> Notary Public
> State of Minnesota
> My Commission Expires
> January 31, 2023

Simons Affidavit Page 2 of 2

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| MATTHEW E. ORSO, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, <br><br> Plaintiff, <br><br> vs. <br><br> TODD DISNER, in his individual capacity and in his capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER;  RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC.; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM; <br><br> Defendants. | No. 3:14-cv-91 |

## ASSIGNMENT OF JUDGMENT

This ASSIGNMENT OF JUDGMENT (this "Assignment") is made as of the 16th day of December, 2019, by Matthew E. Orso, solely in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, ("Assignor") to Nationwide Judgment Recovery, Inc. (as the designee of Big Sky Research Bureau, Inc., the "Assignee") pursuant to, and in furtherance of, the arrangements provided for and in that certain Purchase Agreement by and between Assignor and Assignee, dated as of May 30, 2019, as amended (collectively, the "Agreement").

**EXHIBIT E**

NOW THEREFORE, based on the foregoing and for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, transfers and assigns to Assignee, in respect of the above captioned proceedings, all rights and interests of Assignor in and to those certain Judgments entered in the above referenced action at docket number 179, including each of the individual judgments referenced on docket number 179-2, without recourse, representation or warranty, except as provided for in the Agreement.

THE SALES, TRANSFERS AND ASSIGNMENTS PROVIDED FOR HEREIN ARE EXPRESSLY SUBJECT, IN ALL RESPECTS, TO THE TERMS AND PROVISIONS OF THE AGREEMENT, WHICH ARE INCORPORATED HEREIN BY THIS REFERENCE.

This Assignment shall be governed by, and construed in accordance with, the laws of the State of North Carolina.

IN WITNESS WHEREOF, Assignor has executed this Assignment effective as of December 16, 2019.

Assignor:

Matthew E. Orso, not individually, but solely in his capacity as court-appointed Receiver for Rex Venture Group, LLC dba ZeekRewards.com and its Estate

STATE OF North Carolina

COUNTY OF Mecklenburg

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

Matthew E. Orso.
(name(s) of principal(s))

Date: December 16, 2019

Joan C. Bartley
Notary Public
Print Name: Joan C. Bartley

My commission expires: April 28, 2022

Joan C. Bartley
Notary Public
Mecklenburg County, NC
My Commission Expires Apr. 28, 2022

**EXHIBIT E**

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

FILED
CHARLOTTE, NC

AUG 1 7 2012

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) Civil Action |
| REX VENTURE GROUP, LLC | ) No. 3:12cv519 |
| d/b/a ZEEKREWARDS.COM, and | ) |
| PAUL R. BURKS, | ) |
| | ) |
| Defendant, | ) |
| | ) |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission" or "SEC")

alleges as follows:

**SUMMARY OF ALLEGATIONS**

1.     The Commission files this emergency action to halt the fraudulent

unregistered offer and sale of securities in an unregistered investment contracts

constituting securities in a combined Ponzi and Pyramid scheme perpetrated by

Defendants Rex Venture Group, LLC ("Rex Venture") d/b/a

**EXHIBIT F**

www.ZeekRewards.com ("ZeekRewards") and its principal, Paul Burks ("Burks") (collectively "Defendants").

2.      Defendants solicit investors through the internet and over interstate wires to participate in the ZeekRewards program, a self-described "affiliate advertising division" for the companion website, www.zeekler.com ("Zeekler"), through which Defendants operate penny auctions.

3.      Since approximately January 2011 through the present, the Defendants have raised more than $600 million from approximately 1 million investors nationwide and overseas by making unregistered offers and sales of securities through the ZeekRewards website in the form of Premium Subscriptions and VIP Bids.

4.      Unbeknownst to its investors, ZeekRewards is, in reality, a massive Ponzi and pyramid scheme.

5.      Approximately 98% of ZeekRewards' total revenues, and correspondingly the purported share of "net profits" paid to current investors, are comprised of funds received from new investors.

6.      Defendants currently hold approximately $225 million in investor funds in approximately 15 foreign and domestic financial institutions, and those funds are at risk of imminent dissipation and depletion.

2

**EXHIBIT F**

7.     Defendants have violated, and unless enjoined will continue to violate, the antifraud and securities registration provisions of the federal securities laws.  Unless restrained and enjoined, Defendants are likely to engage in future violations of the federal securities laws.  Accordingly, the Commission (A) seeks to preserve investor funds through an asset freeze, (B) seeks orders (i) for an accounting, (ii) prohibiting the destruction of documents and (iii) appointing a temporary receiver over the Defendants' assets; and (C) seeks preliminary and permanent injunctions, disgorgement with prejudgment interest, and civil penalties against each of the Defendants.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(l) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(l) & 77v(a)] and  Sections 21(d)(l), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa].  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

9.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act, 15 U.S.C.

**EXHIBIT F**

§ 78aa, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Both Defendant Burks and Defendant Rex Venture d/b/a/ ZeekRewards transacted business, and offered and sold the securities that are the subject of this action, to investors in this district.

## DEFENDANTS

10.   **Paul R. Burks**, age 65, is a resident of Lexington, North Carolina. Burks is the sole owner of Rex Venture Group, LLC, and exercises control over ZeekRewards, Zeekler, and other affiliated websites.

11.   **Rex Venture Group, LLC** ("Rex Venture") is a Nevada limited liability company with its principal place of business in Lexington, North Carolina. Rex Venture wholly owns and operates ZeekRewards, an internet website (www.zeekrewards.com) with physical operations in Lexington, North Carolina, and internet customers and contacts throughout the United States and internationally.

4

**EXHIBIT F**

## FACTUAL ALLEGATIONS

### ORIGINS OF ZEEKREWARS

12.     Since 1997, Burks has operated through Rex Venture (and its corporate predecessor) several online, multi-level marketing businesses.

13.     In 2010, Burks created Zeekler.com, a penny auction website offering items ranging from personal electronics to cash.  Penny auctions require participants to pay a non-refundable fee to purchase and place each incremental bid (typically one cent) on merchandise sold via auction.  The penny auctions were not particularly successful until Burks launched ZeekRewards in January 2011.

14.     ZeekRewards is the self-described "private, invitation-only, affiliate advertising division" of Zeekler.  Bidders on Zeekler.com penny auctions can acquire bids by purchasing bids on Zeekler.com, but ZeekRewards and its affiliates also sell or give away free sample bids to be used in the penny auctions.

### THE ZEEKREWARDS OFFERING

15.     Through publicly available websites that Defendants own, operate, control, or sponsor, Defendants solicit persons to become investors or "affiliates" in ZeekRewards.

16.     Through the ZeekRewards program, Defendants offer affiliates several ways to earn money, two of which involve the offer and sale of securities in the form of investment contracts:  the "Retail Profit Pool" and the "Matrix."

**EXHIBIT F**

17.    From at least January 2011 through the present, via the ZeekRewards website, Defendants have raised at least $600 million through the offer and sale of securities (via the Retail Profit Pool and the Matrix) to more than 1 million domestic and international investors.

18.    Defendants have not made any effort to determine if investors in fact have the financial wherewithal to invest, nor have they ever made any effort to determine if investors have any experience investing before investors commit any capital to ZeekRewards.

19.    No registration statement has been filed or has been in effect with the Commission in connection with the securities the Defendants are offering and selling, and have offered and sold.

### 1.  THE RETAIL PROFIT POOL

20.    Defendants attracted new investors to ZeekRewards with the promise of daily profit-share awards distributed through a Retail Profit Pool, which operates as a Ponzi scheme.  According to the ZeekRewards website, through the Retail Profit Pool the company shares "up to 50% of the daily net profits" with affiliates who meet certain qualifications ("Qualified Affiliates").

21.    To become a Qualified Affiliate, investors must satisfy four criteria: (i) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; (ii) enroll new penny auction customers personally, through the

6

### EXHIBIT F

ZeekRewards co-op program, or through third-party businesses endorsed by

ZeekRewards; (iii) sell at retail or purchase and give away as samples a minimum

of ten Zeekler.com bids, earning Profit Points; and (iv) place one free ad daily for

Zeekler.com and submit proof to ZeekRewards.

22.     The requirements to become a Qualified Affiliate constitute an

investment in a common enterprise and require little or no investor effort.

23.     Qualified Affiliates have no role in ZeekRewards' operations.  The

Defendants alone created, update and operate the websites, handle all payments,

manage the bank accounts and payment service providers, manage affiliate and

customer accounts, manage all affiliate and customer services, oversee and

disburse all bids, operate the auctions, create all advertisements, sponsor recruiting

videos and calls, create the advertisements, and decide the daily payout

percentages for the Retail Profit Pool.

24.     Investor funds paid are pooled and comingled in a handful of financial

institutions.  Investor funds also are commingled with ZeekRewards and the penny

auction website's overall revenues from all company operations.

25.     Qualified Affiliates earn Profit Points by either (a) selling penny

auction bid packages directly to retail customers ("Retail Bids"), or (b) purchasing

"VIP Bids" and giving them away as samples to retail customers or to other

personally-sponsored affiliates.

**EXHIBIT F**

26.    Most affiliates opt to simply purchase VIP Bids (up to a maximum

$10,000 investment) and give them away as samples in order to earn Profit Points.

Even then, affiliates need not exert any efforts in giving away the VIP Bids they

purchase because Defendants have created automated programs, including the

"Customer Co-Op" and the "5CC" programs, that generate or have generated

purported customers to whom the bids can be given automatically without any

further effort on the affiliates' part.

27.    Earning daily dividends also requires that affiliates place one free

internet advertisement daily for the company, but that exercise requires little or no

effort.  Affiliates may merely copy and paste free ads – created by Defendants

without input from affiliates – from a company-sponsored program, which the

ZeekRewards website boasts should take no more than five minutes per day.

Affiliates also may employ a third-party program to generate ads automatically for

them; affiliates must simply verify that they've placed the ad by submitting an

internet link to ZeekRewards.  Placing more or better ads does not enhance an

individual's share of profits.

28.    Qualified Affiliates are paid their share of net profits from the Retail

Profit Pool in the form of daily "awards" or dividends on accumulated Profit

Points, which function like shares of stock.

**EXHIBIT F**

29.    The size of the each Qualified Affiliate's daily award is dependent solely on how many Profit Points that investor has accumulated, and is not based on rendering any significant service to ZeekRewards. Thus, buying and giving away more VIP Bids earns greater Profit Points, hence a larger daily profit share award, without any additional effort required.

30.    Qualified Affiliates have the option to receive their daily "award" that typically has approximated 1.5% per day as: (i) a cash payment; (ii) additional Profit Points ; or (iii) a combination of both.

31.    ZeekRewards encourages Qualified Affiliates to convert at least 80% of their daily award as additional Profit Points. Most Qualified Affiliates follow this suggested approach.

32.    The daily award has a compounding effect for those Qualified Affiliates who elect to receive the daily award as new Profit Points rather than cash.

33.    As a result of the compounding effect, Qualified Affiliates now have nearly 3 billion Profit Points outstanding. Based on the ZeekRewards current outstanding Profit Point balance, the company would be obligated to pay out approximately $45 million per day if all Qualified Affiliates elected to receive their daily award in cash.

**EXHIBIT F**

34.    Qualified Affiliates have no role in ZeekRewards' operations.  The

Defendants alone created, update and operate the websites, handle all payments,

manage the bank accounts and payment service providers, manage affiliate and

customer accounts, oversee and disburse all bids, operate the auctions, manage the

Customer Co-Op, manage the 5CC program, create all advertisements, sponsor

recruiting videos and calls, create the advertisements, and decide the daily payout

percentages for the Retail Profit Pool.

35.    Investor funds paid in the form of subscription payments and

purchases of VIP Bids are pooled and commingled in a handful of financial

institutions.   Investor funds also are commingled with ZeekRewards and the penny

auction website's overall revenues from all company operations.

## 2. THE MATRIX

36.    ZeekRewards also employs a pyramid "Matrix" to reward its investors

for recruiting others to join the scheme.  The company places each newly recruited

affiliate into a "2x5 forced-fill matrix," which is a multi-level marketing pyramid

with 63 positions that pools new investors' money and pays a bonus to affiliates

for every "downline" investor within each affiliate's personal matrix.

37.    Affiliates that have (i) enrolled in a monthly subscription plan

requiring payments of $10, $50, or $99 per month; and (ii) recruited at least two

**EXHIBIT F**

other "Preferred Customers" (i.e., investors who have likewise enrolled in a monthly subscription plan) qualify to earn bonuses through the Matrix.

38.   Once qualified, an affiliate earns bonuses and commissions for every paid subscription within her downline 2x5 pyramid, whether or not she personally recruited everyone within the matrix.  Furthermore, affiliates are rewarded merely for recruiting new investors without regard to any efforts by the affiliates to sell bids or otherwise support the retail businesses.

39.   The Defendants, not the investors,  created, update, and operate the websites, handle all payments, manage the bank accounts and payment service providers, manage affiliate and customer accounts, create all advertisements, sponsor recruiting videos and calls, sponsor training videos and calls, and track and determine all Matrix bonus payments.

40.   Investor funds paid in the form of subscription payments are pooled and commingled in a handful of financial institutions along with all of Rex Venture's other revenues.

41.   Investors' Matrix bonuses and the Defendants' profits are both derived from the same source:  the overall revenues generated from new investors to the ZeekRewards program and the penny auction website.

**EXHIBIT F**

## DEFENDANTS' OPERATION OF A FRAUDULENT PONZI AND PYRAMID SCHEME

42.     Defendants represent that through the Retail Profit Pool they will pay investors, or Qualified Affiliates, "up to 50%" of the company's daily net profits in the form of daily profit share awards.

43.     Burks is solely responsible for determining the amount of "net profits" to share in the Retail Profit Pool.

44.     Defendants represent that daily awards are calculated by dividing "up to 50%" of daily net profits by the number of Profit Points outstanding among all Qualified Affiliates. This calculation results in a daily dividend paid to each Qualified Affiliate that consistently has averaged approximately 1.5% per day.

45.     In fact, the dividend bears no relation to the company's net profits. Instead, Burks unilaterally and arbitrarily determines the daily dividend rate so that it averages approximately 1.5% per day, giving investors the false impression that the business is profitable.

46.     Despite encouraging affiliates to purchase and give away VIP Bids to promote and drive traffic to the Zeekler penny auction website, Defendants fail to disclose that almost none of the VIP Bids given away by Qualified investors are actually used on the Zeekler penny auction website. Of approximately 10 billion VIP Bids purchased by or awarded to investors, less than one-quarter of one

**EXHIBIT F**

percent have been actually used in auctions on the Zeekler penny auction website. Thus, the VIP Bids do little or nothing to actually promote the retail business.

47.     Moreover, Defendants fail to disclose that more than 90% of all revenues (and hence net profits) are derived from new investor deposits (in the form of VIP Bid purchases and subscription fees) rather than actual retail revenues.

48.     Defendants also fail to disclose that without new investor deposits (in the form of VIP Bid purchases and subscription fees), revenues would dwindle substantially as less than 10% of daily revenues come from actual retail sales, and the scheme would likely collapse immediately.

49.     Based on the average 1.5% daily dividend on 3 billion Profit Points outstanding, ZeekRewards would owe nearly $45 million per day in profit share awards to investors – ZeekRewards Qualified Affiliates – if investors requested cash rewards instead of points.  The company's actual daily revenues, which in July 2012 averaged approximately $5 million per day, cannot support the daily awards that have been consistently been "paid" or awarded at an average of approximately 1.5% per day.

50.     Defendants fail to disclose to investors that the company would quickly become insolvent if more Qualified Affiliates elected to take daily awards in cash from the Retail Profit Pool rather than converting their awards into ever-increasing accumulated Profit Points.

**EXHIBIT F**

51.    Defendants also fail to inform investors of the substantial risk that the Matrix is prone to collapse if the promoters are unable to recruit ever-increasing numbers of paid affiliates into the Matrix pyramid, because without new investors there will be no source of revenue to pay existing participants in the scheme.

52.    Although to date ZeekRewards has paid out nearly $375 million to Qualified Affiliates through the Retail Profit Pool and the Matrix, the company has only approximately $225 million in deposits, which is insufficient to satisfy future awards based on outstanding Profit Points and Matrix commissions and bonuses.

### RISK OF FURTHER DISSIPATION OF INVESTOR FUNDS

53.    ZeekRewards' current investor payouts are approaching, and may soon exceed, total incoming revenue.  In July 2012, total revenue for ZeekRewards was approximately $162 million, while total investor cash pay-outs were approximately $160 million.  If more Qualified Affiliates in the Retail Profit Pool elect to receive cash payouts for daily awards rather than reinvestment into more VIP Points, ZeekRewards' cash outflows would eventually exceed total revenue.

54.    Burks has withdrawn approximately $11 million while operating Rex Venture and ZeekRewards, of which approximately $4 million remains in his possession, custody or control.

55.    Burks distributed approximately $1 million of the funds garnered from ZeekRewards to family members.

14

**EXHIBIT F**

56.     Defendant Rex Venture currently hold approximately $225 million in investor funds in approximately 15 financial institutions.  These funds are in danger of rapid depletion.

57.     Approximately $40 million of those investor funds are held in the accounts of online payment service providers, of which approximately $30 million are held outside the United States.  The vast majority of these funds are being held by the payment processors as reserves against potential credit card "charge-backs" (i.e., claims for refunds for transactions involving fraud).

58.     The Retail Profit Pool's viability hinges on investors continuing to accept daily rewards in points instead of cash.  With approximately 3 billion VIP Points outstanding in the Retail Profit Pool, if Defendants continue to pay daily awards at their historical average rate of approximately 1.5%, and investors seek cash awards instead of points, investor claims for cash withdrawals could increase to approximately $45 million per day.  With only approximately $225 million on hand, the company would quickly be rendered insolvent.

## FIRST CLAIM FOR RELIEF

### UNREGISTERED OFFER AND SALE OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act

59.     The Commission realleges and incorporates by reference the foregoing paragraphs.

60.    Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

61.    No registration statement has been filed with the Commission or has been in effect with respect to any of the offerings or sales alleged herein.

62.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

63.    The Commission realleges and incorporates by reference the foregoing paragraphs.

64.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

**EXHIBIT F**

a.      with scienter, employed devices, schemes, or artifices to

defraud;

b.      obtained money or property by means of untrue statements of a

material fact or by omitting to state a material fact necessary in

order to make the statements made, in light of the

circumstances under which they were made, not misleading; or

c.      engaged in transactions, practices, or courses of business which

operated or would operate as a fraud or deceit upon the

purchaser.

65.    By engaging in the conduct described above, Defendants violated, and

unless restrained and enjoined will continue to violate, Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

66.    The Commission realleges and incorporates by reference paragraphs 1

through 64 above.

67.    Defendants, and each of them, by engaging in the conduct described

above, directly or indirectly, in connection with the purchase or sale of a security,

by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

68.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Securities and Exchange Commission respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations described hereinabove.

## II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Issue, in a form consistent with Fed. R. Civ. P. 65, as to all Defendants, a permanent injunction freezing the assets of Rex Venture and any entity affiliated with it, directing that all financial or depository institutions comply with the Court's Order, appointing a temporary receiver over the assets of Rex Venture, prohibiting each of the Defendants from destroying documents, requiring accountings from each of the Defendants, and ordering expedited discovery.

## IV.

Order that Defendants, and any employees or agents of Rex Venture, be restrained and enjoined from destroying, removing, mutilating, altering, concealing, or disposing of, in any manner, any of their books, records and

**EXHIBIT F**

documents relating to the matters set forth in the Complaint, or the books, records and documents of any entities under their control, until further order of the Court.

## IV.

Order Rex Venture to disgorge all ill-gotten gains, including prejudgment interest, resulting from the illegal acts or courses of conduct alleged in this Complaint.

## V.

Order Burks to pay $4 million in civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 17, 2012                    Respectfully submitted,

20

**EXHIBIT F**

John J. Bowers (NC Bar No. 23950)
Stephen L. Cohen
J. Lee Buck, II
Brian M. Privor
Alfred C. Tierney
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-xxxx
Telephone:  (202) 551-4645  (Bowers)
Facsimile:  (202) xxx-xxxx
*Email:  BowersJ@sec.gov*

Attorney for Plaintiff
Securities and Exchange Commission

**EXHIBIT F**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | REX VENTURE GROUP, LLC d/b/a ZEEKREWARDS.COM and PAUL R. BURKS |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant    Davidson |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| See attachment | See attachment |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government Plaintiff
☐ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 77e(a), 77e(c), 77q(a), 78j(b) and 17 C.F.R. § 240.10b-5

Brief description of cause:
Action for securities fraud and unregistered offering and sale of securities

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*    JUDGE _____    DOCKET NUMBER _____

DATE  8/17/12    SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**EXHIBIT F**

**ATTACHMENT**

**Counsel to Plaintiff, Securities and Exchange Commission:**

John J. Bowers (NC Bar No. 23950)
Stephen L. Cohen
J. Lee Buck, II
Brian M. Privor
Alfred C. Tierney
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Telephone:  (202) 551-4645  (Bowers)
*Email:  BowersJ@sec.gov*

**Counsel to Defendants, Rex Venture Group LLC d/b/a ZeekRewards.com and Paul R. Burks:**

Noell Tin
Jake Sussman
Missy Owen
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
(p) 704-338-1220
(f) 704-338-1312
email:
ntin@tinfulton.com
jsussman@tinfulton.com
cmowen@tinfulton.com

Peter Bresnan
Simpson Thacher & Bartlett LLP
1155 F Street, N.W.
Washington, D.C. 20004

Tel: (202) 636-5569
Fax: (202) 636-5502
pbresnan@stblaw.com

**EXHIBIT F**

**BELL v. DISNER, Case No. 3:14-cv-91**

**FINAL JUDGMENT**

In accordance with the Court's Order Granting Entry of Final Judgment Against Certain Net Winner Class Members, Final Judgment is hereby entered against Defendant **TONY SIMONS** in the amount of **$208,703.78** which is comprised of $155,406.87 in net winnings from the ZeekRewards scheme and $53,296.91 in prejudgment interest. Post-judgment interest shall accrue on the total amount of this Judgment, including prejudgment interest, at the rate specified under 28 U.S.C. § 1961 from the date of entry of this Judgment until paid in full.

**EXHIBIT G**

According to the records of Rex Venture Group, LLC, and other related information, the "net winnings" of Tony Simons are $155,406.87 determined as follows:

| | | Cash Paid In (a) | | | Commission Payments (b) | | | | | | Net Winnings (c = (b - a)) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Username | Bid Purchases | Subscription Payments | Total | RPP "Profit Share" | Non-Subscription Matrix Payment | Diamond Pool | Subscription Matrix Payments | Special Payout for Checks 5/21/2012 and 5/28/2012 | Total | Net Winnings |
| 4/16/2011 | EUREKA1 | $ - | $ 10.00 | $ 10.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (10.00) |
| 5/14/2011 | EUREKA1 | $ - | $ 10.00 | $ 10.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (10.00) |
| 5/27/2011 | EUREKA1 | $ - | $ 10.00 | $ 10.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (10.00) |
| 7/2/2011 | EUREKA1 | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (99.00) |
| 7/30/2011 | EUREKA1 | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (99.00) |
| 8/22/2011 | EUREKA1 | $ - | $ - | $ - | $ 31.85 | $ - | $ - | $ 52.80 | $ - | $ 84.65 | $ 84.65 |
| 8/27/2011 | EUREKA1 | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (99.00) |
| 8/29/2011 | EUREKA1 | $ - | $ - | $ - | $ 798.17 | $ - | $ - | $ 94.30 | $ - | $ 892.47 | $ 892.47 |
| 9/19/2011 | EUREKA1 | $ - | $ - | $ - | $ 600.15 | $ - | $ - | $ 129.80 | $ - | $ 729.95 | $ 729.95 |
| 9/26/2011 | EUREKA1 | $ - | $ - | $ - | $ 1,299.95 | $ - | $ - | $ 78.50 | $ - | $ 1,378.45 | $ 1,378.45 |
| 10/1/2011 | EUREKA1 | $ - | $ 10.00 | $ 10.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (10.00) |
| 10/3/2011 | EUREKA1 | $ - | $ - | $ - | $ 501.74 | $ - | $ - | $ 105.90 | $ - | $ 607.64 | $ 607.64 |
| 10/10/2011 | EUREKA1 | $ - | $ - | $ - | $ 977.84 | $ - | $ - | $ 44.40 | $ - | $ 1,022.24 | $ 1,022.24 |
| 10/27/2011 | EUREKA1 | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ (99.00) |
| 11/14/2011 | EUREKA1 | $ - | $ - | $ - | $ 1,047.31 | $ 85.00 | $ - | $ - | $ - | $ 1,132.31 | $ 1,132.31 |
| 11/21/2011 | EUREKA1 | $ - | $ - | $ - | $ 2,566.00 | $ 107.20 | $ - | $ - | $ - | $ 2,673.20 | $ 2,673.20 |
| 11/28/2011 | EUREKA1 | $ - | $ - | $ - | $ 3,008.33 | $ - | $ - | $ - | $ - | $ 3,008.33 | $ 3,008.33 |
| 12/5/2011 | EUREKA1 | $ - | $ - | $ - | $ 1,875.40 | $ 438.40 | $ - | $ - | $ - | $ 2,313.80 | $ 2,313.80 |
| 12/12/2011 | EUREKA1 | $ - | $ - | $ - | $ 1,947.26 | $ 335.60 | $ - | $ - | $ - | $ 2,282.86 | $ 2,282.86 |
| 12/19/2011 | EUREKA1 | $ - | $ - | $ - | $ 2,203.11 | $ 249.30 | $ - | $ - | $ - | $ 2,452.41 | $ 2,452.41 |
| 12/26/2011 | EUREKA1 | $ - | $ - | $ - | $ 1,604.26 | $ 142.60 | $ - | $ - | $ - | $ 1,746.86 | $ 1,746.86 |
| 1/2/2012 | EUREKA1 | $ - | $ - | $ - | $ 1,797.09 | $ 156.00 | $ - | $ 230.40 | $ - | $ 2,183.49 | $ 2,183.49 |
| 1/16/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,090.11 | $ 557.80 | $ - | $ - | $ - | $ 2,647.91 | $ 2,647.91 |
| 1/23/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,038.80 | $ 362.58 | $ - | $ - | $ - | $ 2,401.38 | $ 2,401.38 |
| 1/30/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,635.95 | $ - | $ - | $ 306.30 | $ - | $ 2,942.25 | $ 2,942.25 |
| 2/6/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,595.08 | $ 296.80 | $ - | $ - | $ - | $ 2,891.88 | $ 2,891.88 |
| 2/13/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,049.02 | $ 301.40 | $ - | $ - | $ - | $ 3,350.42 | $ 3,350.42 |
| 2/20/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,510.01 | $ - | $ - | $ 404.40 | $ - | $ 2,914.41 | $ 2,914.41 |
| 2/27/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,759.48 | $ - | $ 1.39 | $ 340.00 | $ - | $ 3,100.87 | $ 3,100.87 |
| 3/5/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,169.46 | $ 1,419.30 | $ - | $ - | $ - | $ 4,588.76 | $ 4,588.76 |
| 3/12/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,553.28 | $ 593.20 | $ - | $ - | $ - | $ 4,146.48 | $ 4,146.48 |
| 3/19/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,021.70 | $ - | $ - | $ 615.10 | $ - | $ 3,636.80 | $ 3,636.80 |
| 3/26/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,660.11 | $ - | $ - | $ 470.20 | $ - | $ 4,130.31 | $ 4,130.31 |
| 4/2/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,565.29 | $ - | $ - | $ 82.50 | $ - | $ 3,647.79 | $ 3,647.79 |
| 4/9/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,423.31 | $ - | $ - | $ - | $ - | $ 3,423.31 | $ 3,423.31 |
| 4/16/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,766.39 | $ - | $ - | $ - | $ - | $ 2,766.39 | $ 2,766.39 |
| 4/23/2012 | EUREKA1 | $ - | $ - | $ - | $ 3,640.64 | $ 1,279.00 | $ - | $ - | $ - | $ 4,919.64 | $ 4,919.64 |
| 4/30/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,973.95 | $ 697.60 | $ - | $ - | $ - | $ 3,671.55 | $ 3,671.55 |
| 5/7/2012 | EUREKA1 | $ - | $ - | $ - | $ 338.15 | $ 608.50 | $ - | $ - | $ - | $ 946.65 | $ 946.65 |
| 5/14/2012 | EUREKA1 | $ - | $ - | $ - | $ 2,827.03 | $ 604.90 | $ - | $ - | $ - | $ 3,431.93 | $ 3,431.93 |
| 5/21/2012 | EUREKA1 | $ - | $ - | $ - | $ - | $ 6,947.65 | $ - | $ - | $ - | $ 6,947.65 | $ 6,947.65 |
| 5/28/2012 | EUREKA1 | $ - | $ - | $ - | $ - | $ 231.10 | $ - | $ - | $ - | $ 231.10 | $ 231.10 |
| 6/4/2012 | EUREKA1 | $ - | $ - | $ - | $ - | $ 7,484.05 | $ - | $ - | $ - | $ 7,484.05 | $ 7,484.05 |
| 6/6/2012 | EUREKA1 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,552.83 | $ 1,552.83 | $ 1,552.83 |
| 6/18/2012 | EUREKA1 | $ - | $ - | $ - | $ 751.00 | $ 253.00 | $ - | $ - | $ - | $ 1,004.00 | $ 1,004.00 |
| 7/2/2012 | EUREKA1 | $ - | $ - | $ - | $ 13,056.85 | $ - | $ - | $ - | $ - | $ 13,056.85 | $ 13,056.85 |
| 7/9/2012 | EUREKA1 | $ - | $ - | $ - | $ 9,332.10 | $ - | $ - | $ - | $ - | $ 9,332.10 | $ 9,332.10 |
| 7/10/2012 | EUREKA1 | $ - | $ - | $ - | $ - | $ - | $ - | $ 324.80 | $ - | $ 324.80 | $ 324.80 |
| 7/16/2012 | EUREKA1 | $ - | $ - | $ - | $ 6,000.00 | $ 3,504.80 | $ - | $ - | $ - | $ 9,504.80 | $ 9,504.80 |
| 7/23/2012 | EUREKA1 | $ - | $ - | $ - | $ 6,096.47 | $ 1,508.10 | $ - | $ - | $ - | $ 7,604.57 | $ 7,604.57 |
| 7/26/2012 | EUREKA1 | $ - | $ - | $ - | $ 6,584.44 | $ 255.10 | $ - | $ - | $ - | $ 6,839.54 | $ 6,839.54 |
| 7/30/2012 | EUREKA1 | $ - | $ - | $ - | $ 8,919.99 | $ 967.20 | $ - | $ - | $ - | $ 9,887.19 | $ 9,887.19 |
| 8/16/2012 | EUREKA1 | $ - | $ - | $ - | $ 8,956.25 | $ 871.20 | $ - | $ - | $ - | $ 9,827.45 | $ 9,827.45 |
| **Total** | | $ - | $ 436.00 | $ 436.00 | $ 130,573.32 | $ 30,582.18 | $ 1.39 | $ 2,954.60 | $ 1,552.83 | $ 165,664.32 | $ 165,228.32 |

Net Activity: $ 165,228.32
Less NxPay Frozen Funds: $ 9,821.45
Less Additional Purchases: $ -

**Net Winnings: $ 155,406.87**

# EXHIBIT H